**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

THE ESTATE OF MARQUEZ SMART,
by Randall Smart and Brenda Bryant as
Administrators of the Estate of Marquez
Smart, deceased; RANDALL SMART and
BRENDA BRYANT as heirs of Marquez
Smart, deceased,

     Plaintiffs - Appellants,

v.

THE CITY OF WICHITA; POLICE
OFFICERS LEE FROESE and AARON
CHAFFEE, in their individual and official
capacities,

     Defendants - Appellees.
------------------------------

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES UNION
OF KANSAS; CATO INSTITUTE;
KAREN M. BLUM, Scholars of the Law
of Qualified Immunity; ALAN K. CHEN,
Scholars of the Law of Qualified
Immunity; BARRY FRIEDMAN, Scholars
of the Law of Qualified Immunity; JOHN
F. PREIS, Scholars of the Law of Qualified
Immunity; ALEXANDER A. REINERT;
JOANNA C. SCHWARTZ, Scholars of the
Law of Qualified Immunity; MARTIN A.

No. 18-3242

SCHWARTZ, Scholars of the Law of
Qualified Immunity; INTERNATIONAL
MUNICIPAL LAWYERS
ASSOCIATION,

Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:14-CV-02111-JPO)**

_____

Amir H. Ali, Roderick & Solange MacArthur Justice Center, Washington, D.C.
(Andrew B. Protzman and Ben Stelter-Embry, Protzman Law Firm, LLC, Kansas City,
Missouri; Bradley D. Kuhlman, Kuhlman & Lucas, LLC, Kansas City, Missouri; David
M. Shapiro, Roderick & Solange MacArthur Justice Center, Chicago, Illinois, with him
on the briefs), for Plaintiffs – Appellants.

Samuel A. Green (J. Steven Pigg with him on the brief), Fisher, Patterson, Sayler &
Smith, L.L.P., Topeka, Kansas, for Defendants – Appellees.

Lauren Bonds, ACLU Foundation of Kansas, Overland Park, Kansas, and Jay R.
Schweikert, CATO Institute, Washington, D.C., filed an amicus brief on behalf of
The American Civil Liberties Union, American Civil Liberties Union of Kansas, and
CATO Institute in support of Appellants.

Debo P. Adegbile, Jamie Stephen Dycus, Stephanie Simon, and Cassandra Mitchell,
Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York, filed an amicus
brief on behalf of Scholars of the Law of Qualified Immunity in support of Appellants.

Christopher D. Balch, The Balch Law Group, Atlanta, Georgia, filed an amicus brief on
behalf of the International Municipal Lawyers Association in support of Appellees.

_____

Before **BACHARACH**, **McHUGH**, and **EID**, Circuit Judges.

_____

**McHUGH**, Circuit Judge.

_____

2

In the early morning hours of March 10, 2012, as hundreds of people emptied out of bars and concert venues in Wichita's Old Town neighborhood at closing time, Wichita Police Officers Lee Froese and Aaron Chaffee fatally shot Marquez Smart. Mr. Smart's estate and heirs sued the City of Wichita, along with Officers Froese and Chaffee, alleging the officers used excessive force against Mr. Smart. The district court granted summary judgment in favor of Officers Froese and Chaffee on the basis of qualified immunity, reasoning that although the jury could find that the officers had violated Mr. Smart's right to be free from excessive force, the officers had not violated clearly established law under the facts presented. The district court also granted summary judgment in favor of the City.[1] We affirm in part, reverse in part, and remand to the district court for further proceedings.

## I.     BACKGROUND

### A. *Factual History*

We recount the facts in the light most favorable to the non-movants, the plaintiffs, as we must at the summary judgment stage. *See Davis v. Clifford*, 825 F.3d 1131, 1133 (10th Cir. 2016).

On the evening of March 9, 2012, Mr. Smart, who is black, attended a concert at Doc Howard's, a large bar and concert venue in the Old Town neighborhood of

---

[1] Mr. Smart does not challenge the district court's judgment in favor of the City on appeal.

3

Wichita, Kansas. Doc Howard's was located on Mosley Street along with several

other bars, concert venues, and a parking garage, as depicted in the map below:[2]



According to Latyra James, an acquaintance of Mr. Smart who attended the

concert with him that night, she and Mr. Smart left Doc Howard's with a group of

---

[2] This map appears in the record without labels. For reader convenience, we have added labels of the key locations, based on undisputed record evidence. *See Pahls v. Thomas*, 718 F.3d 1210, 1216 n.1 (10th Cir. 2013). The handwritten marks on the upper-middle portion of the map were apparently made during a deposition and are not referenced in this decision.

people around closing time and "all started walking towards" the parking garage on Mosley Street. App. at 268. Ms. James was "a couple of feet away from" Mr. Smart and "didn't have any trouble seeing him" when she "heard gunshots." *Id.* at 270. She confirmed that the "first gunshot . . . wasn't near" her group and Mr. Smart "wasn't holding his arm out like he was shooting a gun or anything like that." *Id.* at 271. After the first shot, Ms. James recounted, "everybody [was] running around [like] crazy" and Mr. Smart "tried to run down the alleyway" that intersected Mosley Street next to the parking garage. *Id.* at 271–72, 274.

Aundras Wilson, a long-time friend of Mr. Smart who was also with him that night, similarly indicated he never saw any gun other than the officers' guns, did not see anyone other than the officers shoot, and did not "know of [Mr. Smart] ever having a gun." *Id.* at 208. DeShawn Wheaton, a bystander, also testified he never saw anyone except the police shooting and never saw Mr. Smart with a gun in his hand, although Mr. Wheaton admitted he only heard, but did not see, the first few shots. Two other police officers who witnessed the shooting likewise stated they did not see a gun in Mr. Smart's hand.

Officer Froese testified that he arrived in Old Town shortly before closing time, along with several other officers, to help with routine crowd control. As "hundreds" of people started emptying out of the bars and concert venues, Officer Froese began crossing Mosley Street to intervene in a fight involving a large group of people when he heard "one extremely loud gunshot" from another direction. *Id.* at 178, 175. Officer Froese turned and saw a black man "with his hand

5

extended . . . with a big black gun in his hand, and then [he] saw two more shots, and [he] saw [a] muzzle flash." *Id.* at 176. He testified that the shooter, whom he identified during his deposition as Mr. Smart,[3] fired those two shots toward "a big crowd of people . . . in the middle of [Mosley Street]." *Id.* at 177.

Officer Froese stated he was then "totally focused on" Mr. Smart, who was running in a crouched stance down the side of Mosley Street where the parking garage was located. *Id.* at 176. Officer Froese ran toward Mr. Smart and fired one shot at him. Mr. Smart kept running, though "slow[ing] slightly," and when Officer Froese was about five feet "directly behind" Mr. Smart, he "fire[d] four additional shots" in rapid succession. *Id.* at 184–85. Mr. Smart kept running and started "to turn west into the alleyway," then Officer Froese "hear[d] some shots to [his] right" from Officer Chaffee. *Id.* at 186–87. Officer Froese testified he did not recall warning Mr. Smart or ordering him to drop the gun, nor did he hear any other officer do so.

Officer Chaffee, a member of the Wichita Police Department's gang intelligence team, had also arrived in Old Town shortly before closing time in response to another officer's report of a gun in a parked car. But as crowds started flowing from the bars and concert venues into the street, Officer Chaffee began helping with crowd control. Officer Chaffee stood on the ledge of an elevated flower

---

[3] Officer Froese described Mr. Smart as wearing a "yellow collared shirt." App. at 171. Although the officers emphasize that Mr. Smart was a young black man wearing a yellow shirt, the record indicates that yellow Wichita State gear was common in the area. Officer Froese also recalled that a majority of the crowd that night was black, like Mr. Smart.

bed "to look into the crowd and make sure there wasn't any disturbance or anything going on that needed any kind of attention." *Id.* at 123. He recalled:

> And then, at some point while scanning—scanning the area, on the west side of the street I saw a group of people start to scatter, kind of running towards the south. That catches my eye, and so as I look over I . . . see the people scatter, and I start to hear the gunshots, and I see a black male with a yellow shirt standing there with his right arm indexed out at the crowd.

*Id.* at 124. Officer Chaffee estimated he initially heard "four to five" shots. *Id.* at 126. From that time on, Officer Chaffee testified he watched Mr. Smart run north along the street and only briefly lost sight of Mr. Smart when he ran behind others in the crowd. Officer Chaffee also stated that Mr. Smart was running "exactly [like] what [Officer Chaffee] had experienced in the past" when people fled the police—running fast and crouching low. *Id.* at 132. As Officer Chaffee moved west across Mosley Street to intercept Mr. Smart, he saw Officer Froese and heard a second volley of "two or three more shots," but could not tell whether an officer or someone else had fired the shots. *Id.* at 133.

Mr. Smart "[fell] to the ground once he started running through the alley" off Mosley Street. *Id.* at 281. DeShawn Wheaton, a bystander, saw Mr. Smart "on the ground [with] his arms stretched out" with nothing in his hands, "looking back" at Officer Chaffee and shaking his head. *Id.* at 201, 202. Mr. Wheaton then saw Officer

7

Chaffee fire "about three more shots" at Mr. Smart.[4] *Id.* at 201. The gunshot wounds killed Mr. Smart.

According to Adron Jones, a bystander, about five seconds elapsed from the first shot Officer Chaffee fired until his final shots. Sergeant Gulliver, another police officer who witnessed the shooting, estimated about five seconds elapsed from when he first saw Officer Chaffee chasing Mr. Smart until Officer Chaffee began firing at Mr. Smart.

Police recovered a .45 caliber handgun, with the magazine missing, about ten feet from where Mr. Smart fell. Along the path between the spot where the officers first saw Mr. Smart and the spot where Mr. Smart fell, police found a magazine for a .45 caliber handgun, two .45 caliber shell casings, and Mr. Smart's eyeglasses. Forensic analysis specifically linked the two shell casings to the handgun found near Mr. Smart. The chief medical examiner who performed Mr. Smart's autopsy could not verify that Mr. Smart had fired a gun that night because she found no gunshot residue on Mr. Smart's hands. Dr. Christian Westering, an expert for the plaintiffs, tested DNA found on approximately eighteen samples from the handgun, magazine, and shell casings. Two of those samples had too many contributors to draw conclusions; six samples excluded Mr. Smart as a contributor; the remaining samples could not exclude Mr. Smart as a contributor.

---

[4] Ms. James and Mr. Wilson similarly testified that Officer Chaffee fired additional shots at Mr. Smart after he fell.

Dr. Wayne K. Ross, the plaintiffs' medical expert, stated Mr. Smart was shot five times "from behind." *Id.* at 314. He further testified that three of the bullet wounds exhibited "shoring"—that is, an abrasion around a wound site indicating that the "skin [was] rubbing against a firm surface at the time of the" exit wound. *Id.* at 316, 320–21. Based on these "shored" exit wounds, Dr. Ross opined that Mr. Smart was on the ground when he suffered the final three gunshot wounds. The plaintiffs also retained a biomechanics expert who concluded that "the trajectories of Mr. Smart's gunshot wounds are not biomechanically consistent with him running . . . in a crouched, . . . bent over position," as Officers Froese and Chaffee described. App. at 328.

### B. *Procedural History*

Mr. Smart's estate and heirs sued Officer Froese, Officer Chaffee, and the City of Wichita, alleging that the officers had used excessive force against Mr. Smart and that this was due to an unlawful policy, practice, or custom adopted by the City. The plaintiffs also advanced claims for negligence and wrongful death under Kansas state law.[5] The district court[6] granted summary judgment for Officers Froese and Chaffee on qualified immunity grounds. *Estate of Smart v. City of Wichita*, No. 14-2111-JPO, 2018 WL

---

[5] Apart from the question whether the district court should exercise supplemental jurisdiction over the state law claims, which we address below, the state law claims and municipal liability claim are not at issue in this appeal.

[6] The parties consented to a magistrate judge conducting all the proceedings in this case. Because the magistrate judge acted "on behalf of the district court," *Krauser v. Astrue*, 638 F.3d 1324, 1333 (10th Cir. 2011), we refer to the actions of the district court throughout this opinion.

3744063, at *17 (D. Kan. Aug. 7, 2018). The court determined that, taking the disputed facts in the light most favorable to the plaintiffs, Officers Froese and Chaffee "violated [Mr.] Smart's Fourth Amendment right to be free from an unreasonable use of deadly force." *Id.* Nevertheless, the court concluded the plaintiffs had "not satisfied [the] onerous standard" of showing the officers had violated clearly established law. *Id.* at *18. The court also granted summary judgment in favor of the City, finding the plaintiffs had "fail[ed] to point to facts showing a City custom or policy was the moving force behind [Mr.] Smart's shooting." *Id.* at *21. And the court declined to exercise supplemental jurisdiction over the plaintiffs' remaining state-law claims. *Id.* After the district court denied the plaintiffs' motion for reconsideration, the plaintiffs filed a timely appeal.

## II.  DISCUSSION

### A. *Summary Judgment Based on Qualified Immunity*

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). When a § 1983 defendant asserts qualified immunity, this affirmative defense "creates a presumption that [the defendant is] immune from suit." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016). "To overcome this presumption," the plaintiffs bear the burden of "show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a

10

violation of that right." *Id.* (quoting *Mullenix*, 136 S. Ct. at 308). Regarding the second prong of the qualified immunity test, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix*, 136 S. Ct. at 308 (alteration in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "[S]pecificity is especially important in the Fourth Amendment context, where . . . 'it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)). Nevertheless, our analysis is not a "scavenger hunt for prior cases with precisely the same facts," *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quotation marks omitted), and "a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law," *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 1347 (2019). *See Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) ("The plaintiff is not required to show . . . that the very act in question previously was held unlawful . . . ." (quotation marks omitted)). Rather, "'[t]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (second and third alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). This requirement is satisfied where, at the time of the conduct in question, there existed "a Supreme Court or Tenth Circuit decision on point, or the

11

clearly established weight of authority from other courts . . . found the law to be as the plaintiff maintains." *Halley*, 902 F.3d at 1149 (quotation marks omitted).

Applying our summary judgment standard to the question whether a plaintiff has satisfied this two-prong test, we will affirm a district court's grant of qualified immunity "unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Gutierrez v. Cobos*, 841 F.3d 895, 900–01 (10th Cir. 2016) (quotation marks omitted). Whether a reasonable jury could do so turns on whether there exists a "genuine dispute as to any material fact." *Id.* at 900 (quoting Fed. R. Civ. P. 56(a)). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party," here Mr. Smart's estate. *Id.* (quotation marks omitted). Thus, if "the record shows an unresolved dispute of historical fact relevant to the immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (quotation marks omitted). Moreover, "[w]e review grants of summary judgment based on qualified immunity de novo." *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (quotation marks omitted).

The plaintiffs allege Officers Froese and Chaffee violated Mr. Smart's constitutional rights in three ways: (1) shooting an unarmed man, (2) failing to warn Mr. Smart before opening fire, and (3) shooting Mr. Smart after it became clear he posed no threat. We consider each of these issues in turn.

12

## 1. Shooting an Unarmed Man

The plaintiffs first argue that Officers Froese and Chaffee violated clearly established law by shooting Mr. Smart despite the fact that Mr. Smart was unarmed and posed no threat to anyone. We conclude that a reasonable jury could find that Officers Froese and Chaffee violated Mr. Smart's constitutional rights but ultimately conclude that the alleged violation was not clearly established.

### a. Whether a reasonable jury could find facts supporting a violation of a constitutional right

The threshold question is, taking the facts in the light most favorable to the plaintiffs, whether a jury could conclude Mr. Smart was unarmed. Officers Froese and Chaffee both testified they saw Mr. Smart holding and firing a gun. Officer Brad Crouch and bystander Adron Jones also reported they saw Mr. Smart holding a gun. And it is undisputed that a .45 caliber handgun was recovered about ten feet from where Mr. Smart fell and that two shell casings found along the path Mr. Smart ran were forensically linked to that handgun.[7]

On the other hand, the plaintiffs adduced testimony from witnesses who said they did not see Mr. Smart fire a gun during the incident, or that they never knew Mr. Smart to

---

[7] The plaintiffs suggested for the first time at oral argument that the police, knowing they shot an unarmed man, planted the gun and perjured themselves as part of a cover-up. But this theory was not raised in the opening brief before this court and we do not consider it. *See City of Colo. Springs v. Solis*, 589 F.3d 1121, 1135 n.5 (10th Cir. 2009) ("[A]rguments not raised in the opening brief are waived."); *Fed. Ins. Co. v. Tri-State Ins. Co.,* 157 F.3d 800, 805 (10th Cir. 1998) ("Issues raised for the first time at oral argument are considered waived.").

own a gun. For example, Sergeant Gulliver testified he never saw a gun in Mr. Smart's hand, although he was quick to clarify he was "not saying it's not possible he had a gun." Supp. App. at 167. Mr. Wilson—a longtime friend of Mr. Smart—could not see Mr. Smart when the shooting began, but testified he never knew of Mr. Smart owning or carrying a gun. The plaintiffs also observe that DNA testing excluded Mr. Smart as a contributor for some (though not all) of the samples recovered from the .45 handgun and that a medical examiner found no gunshot residue on Mr. Smart's hands during the autopsy.[8] Finally, Ms. James, who was within sight of Mr. Smart when the shooting began, testified she did not see him shooting a gun or holding his arm out, and she claimed the initial gunshots came from some distance away from where she and Mr. Smart were standing.

Officers Froese and Chaffee argue this evidence, while it does not positively *corroborate* the claim that Mr. Smart had a gun, is entirely consistent with the possibility that he did have a gun. To be sure, the fact that one bystander did not see Mr. Smart shooting a gun does not necessarily controvert another's claim that he did shoot a gun. But the plaintiffs' inability to conclusively prove a negative (i.e., that Mr. Smart did not brandish or shoot a gun) does not prevent their evidence from creating a genuine dispute of fact.

---

[8] The plaintiffs also point to testimony that other people in the crowd, like Ms. James, were shot by police officers. But this evidence does not negate the possibility that Mr. Smart fired a gun; it simply means at least one police officer *also* fired a gun.

14

We addressed a similar situation in *Pauly v. White*, 874 F.3d 1197, 1202–05 (10th Cir. 2017), where police officers fatally shot a suspect who they testified had fired on them. Although the plaintiffs there could not point to any evidence squarely contradicting the officers' claims that the suspect had shot at them, we nevertheless held the plaintiffs' circumstantial evidence (particularly the lack of a bullet casing in the room where the suspect allegedly fired a gun) created a dispute of material fact:

> Indeed, "considering the physical evidence together with the inconsistencies in the officer[s'] testimony, a jury will have to make credibility judgments, and credibility determinations should not be made on summary judgment." Moreover, "since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify."

*Id.* at 1217–18 (citations omitted) (quoting *Abraham v. Rason*, 183 F.3d 279, 294 (3d Cir. 1999)). We concluded that in such cases, we "must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." *Id.* at 1218 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

Here, the plaintiffs' forensic evidence, the multiple eyewitnesses who did not see Mr. Smart holding a gun (particularly Ms. James, who was standing only a few feet from Mr. Smart), and the testimony from Mr. Smart's longtime friend, Mr. Wilson, that Mr. Smart never owned or carried a gun, all "tend to discredit the police officers['] story" at least as strongly as in *Pauly*, creating a dispute of fact as to whether Mr. Smart had a gun on the night of the shooting. *Id.* at 1218 (quoting *Scott*, 39 F.3d at 915). We therefore must assume for purposes of summary judgment that Mr. Smart was unarmed. *See*

15

*Gutierrez*, 841 F.3d at 900. Importantly, however, the assumption that Mr. Smart was unarmed does not resolve whether the officers violated his constitutional rights. The salient question is whether the officers' mistaken perceptions that Mr. Smart was the shooter were reasonable. *See Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) (explaining "reasonable perceptions are what matter[]" in concluding officer's decision to shoot at suspect's car as the car started driving away was "reasonable, even if mistaken"). "An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances." *Id.*; *see also Pearson*, 555 U.S. at 231 ("The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting))).

The district court analyzed the officers' decision to use deadly force under the three non-exclusive factors the Supreme Court has identified in considering whether police officers' use of deadly force is justified. *See Smart*, 2018 WL 3744063, at *11–15. These factors are: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). We have held the *Graham* framework allows the use of deadly force where "a reasonable officer . . . would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir.

16

1995). If Mr. Smart was in fact shooting into a crowd, deadly force would plainly be justified under this standard. But because we assume for purposes of summary judgment that Mr. Smart was *not* the active shooter, the relevant question here is whether the officers acted reasonably in light of the mistaken perception that Mr. Smart was the active shooter.

Several pieces of evidence, when construed in the light most favorable to the plaintiffs, cast some doubt on the reasonableness of the officers' belief that Mr. Smart was an active shooter: first, Ms. James's testimony that the shots did not come from where Mr. Smart was standing suggests that Officers Froese and Chaffee should not have concluded Mr. Smart fired the shots they heard. Second, Ms. James's testimony that Mr. Smart was not holding a gun or extending his arm suggests the officers should not have concluded Mr. Smart was holding "a big black gun," as Officer Froese apparently did, or holding his arm out in the manner Officer Chaffee described. *See King v. Hill*, 615 F. App'x 470, 475 (10th Cir. 2015) (unpublished) (determining a jury could find officer's mistaken belief that suspect was holding a gun unreasonable where plaintiff's evidence suggested suspect's hands were visible and he had no gun); *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006) (concluding "[p]laintiff's version of events suggests that [police officer] acted precipitously in shooting [plaintiff]" where evidence suggested "angle of [suspect's] hands and the amount of light on the scene" would have allowed police to see suspect's hands).

On the other hand, there is also evidence that supports the officers' conclusion that Mr. Smart was an active shooter: Mr. Smart "ran north" while the "bulk of the crowd"

17

ran south, "reinforc[ing] the officers' perception that [Mr.] Smart was the shooter."[9]

Response Br. at 30. A bystander with no connection to the police officers, Adron Jones,

also testified he saw a man he believed was Mr. Smart "running" with "[a] gun in his

hand." Supp. App. at 195. That another eyewitness believed Mr. Smart was running with

a gun, although not known to the officers at the time, bolsters the officers' reasonableness

in drawing the same conclusion from the observable circumstances.

Considering all the evidence in the light most favorable to the plaintiffs, the jury

could conclude that the officers unreasonably concluded that Mr. Smart was the active

shooter. That is, the jury could conclude that the officers violated Mr. Smart's

constitutional right to be free from excessive force.

b. *Whether the alleged violation was clearly established*

To rebut the presumption of qualified immunity, however, Mr. Smart must also

establish that the constitutional right was clearly established. For these purposes, "[t]he

---

[9] Although we have never held that a suspect running in the opposite direction of a crowd constitutes reliable evidence that a suspect is an active shooter, this "split-second judgment[]," *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) (quoting *Graham*, 490 U.S. at 397), deserves at least some weight in determining whether the officers reasonably identified Mr. Smart as the shooter. To be sure, as the district court observed, this observation could conceivably weigh *against* the officers' decision to use deadly force: it shows Mr. "Smart was not attempting to close the distance between himself and the officers (or bystanders); rather, he was running away. This . . . suggests [Mr.] Smart did not pose a threat to the safety of the officers or others." *Smart*, 2018 WL 3744063, at *13. Nevertheless, given that he was in a crowded area and the officers reasonably believed he was still carrying a gun, the fact that he happened to be running from the officers does little to undermine or support the reasonableness of the officers' perception that he posed an immediate threat to bystanders.

dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *See Mullenix*, 136 S. Ct. at 308 (quoting *al-Kidd*, 563 U.S. at 742). Here, an analysis of the officers' "particular conduct" requires taking into account the fact that they were apparently facing a chaotic active shooter situation, where the lives of bystanders may have depended on the officers' split-second judgment. *See id.*

The state of the law on March 10, 2012, did not provide fair warning to Officers Froese and Chaffee that it was unconstitutional for them to open fire on a fleeing person they (perhaps unreasonably) believed was armed in what they believed to be an active shooter situation. On this prong of the analysis, we assume that Mr. Smart was unarmed, and that Officers Froese and Chaffee were unreasonable to think otherwise. We nevertheless conclude that their decision to open fire on Mr. Smart did not violate clearly established law.

Plaintiffs rely on two decisions as support for their argument that the officers violated clearly established law by unreasonably misidentifying Mr. Smart as the active shooter. But neither case would have provided guidance to Officers Froese and Chaffee under the particular circumstances here.

In *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989), officers responded to reports of a suspect kicking the front door of a restaurant and breaking the glass. When the police arrived, the suspect was in a heated exchange with four teenagers, one of whom saw the suspect pull a pair of fingernail clippers from his pocket. *Id.* The teenager yelled to the police that the suspect had a knife and the police shot and killed the suspect as he approached the officers. *Id.* We denied qualified immunity, noting a jury could have

19

concluded that the suspect was ten to twelve feet away from the officers when they shot him, "was neither charging . . . nor stabbing at [an officer]," "was shot after [he] stopped and was trying to explain what was going on," and another officer testified she could not see a weapon in the suspect's hand. *Id.* at 275 (internal quotation marks omitted).

In *King v. Hill*, officers shot a suspect they believed "had a long gun under [his] coat." 615 F. App'x at 472. We held a jury could find the officers violated clearly established law despite their belief the suspect had a gun, noting a jury could find the suspect "raised his hands in a non-threatening manner in response to police commands, and at the time he was shot [he] was not making any threatening motions towards the officers," who were "between 25 and 75 yards away." *Id.* at 472, 476.

It is true that *Zuchel* and *King* both involve police shooting a suspect they mistakenly believed to be armed and dangerous. But neither provides meaningful guidance here. Unlike the officers in those cases, Officers Froese and Chaffee saw a suspect brandishing and firing a gun—although they may have been mistaken in identifying that suspect as Mr. Smart. And these events transpired in a large, chaotic crowd of potential victims. Thus, although *Zuchel* and *King* establish that officers *can* violate clearly established law by acting on a grossly mistaken belief that a suspect poses a deadly threat, neither case—nor any other Tenth Circuit or Supreme Court case our research has uncovered—would have given fair notice to officers deciding whether to engage a perceived active shooter in a crowded area.[10]

---

[10] Further bolstering this conclusion is the Supreme Court's instruction that qualified immunity ought to "give[] government officials breathing room to make

20

Plaintiffs invoke various decisions from other circuits, but those decisions also do not clearly establish a constitutional violation on these facts. For example, in *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019), the Fifth Circuit—sitting en banc— denied qualified immunity to officers who fatally shot without warning a teenager with a gun pointed at his own head who "posed no threat" to the officers. *Id.* at 453. The court found the law to be clearly established because it was dealing with "an obvious case." *Id.* But there is nothing obvious about this case, which arises in the uniquely fraught context of a perceived active shooter situation on a crowded street.

The dissent cites several cases it argues "clearly establish the unlawfulness of shooting a person who does not present a reasonable threat to the safety of officers or the public." Dissent at 15. But none of these cases offers meaningful guidance to officers engaging a suspected active shooter because none of them involves the need to neutralize a hostile gunman surrounded by potential victims. *See Tennessee v. Garner*, 471 U.S. 1, 3 (1985) (holding officers acted unreasonably by shooting burglary suspect in the back as he fled); *Walker*, 451 F.3d at 1160 (holding officers acted unreasonably where they shot a man who held a box cutter to his own wrist, was not threatening the officers, and whose crimes "were not particularly severe");

---

reasonable but mistaken judgments." *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). We agree with the district court that this consideration is particularly compelling in active shooter situations like this one, where "[o]fficers [are] confronted with a chaotic situation and the need to quickly disarm the shooter to protect innocent bystanders." *Smart*, 2018 WL 3744063, at *18.

21

*Carr v. Castle*, 337 F.3d 1221, 1224–25 (10th Cir. 2003) (holding officers acted unreasonably by shooting a fleeing assault suspect who was holding a piece of concrete which the officers testified he had dropped before they started shooting); *see also Clawson v. Rigney*, 777 F. App'x 381, 385 (11th Cir. 2019) (unpublished) (holding officer acted unreasonably by shooting suspect who was moving away from officers, was armed with a knife, "was at least fifteen feet" away from an officer on the other side of a hedge, and "by all accounts, was not armed with a gun"). Abstracting these holdings to the situation here "defines the qualified immunity inquiry at too high a level of generality" and conflates the two prongs of the test. *See Mullenix*, 136 S. Ct. at 311. In fact, the Supreme Court has repeatedly chastised courts for relying in such a manner on its broad statement of the law in *Garner*. *See id.* at 309; *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).[11]

In summary, there is evidence from which the jury could conclude that the officers were mistaken in their belief that Mr. Smart was the active shooter. And there is also evidence from which the jury could conclude, with the benefit of hindsight, their mistake was not reasonable. But there is no clearly established law

---

[11] The dissent critiques us for using the label "active shooter" because "no one suggests that the gunshots continued once the chase began." Dissent at 16. But Latyra James testified that "everybody [was] running around [like] crazy," and "the gunshots just kept getting closer and closer." App. at 271–72. None of the cases cited by the dissent addressed a similar situation involving hundreds of people and mass panic. And even if the dissent is correct that "the unknown shooter was no longer 'active' by the start of the chase," dissent at 16, the state of the law on March 10, 2012, did not put Officers Froese and Chaffee on notice that they needed to wait for more gunshots before responding to what was certainly an active threat.

22

that establishes, under the unique facts presented during an active shooter situation, that the officers should have been on notice their actions were unconstitutional.

## 2. Failing to Warn Mr. Smart

The plaintiffs also argue that Officers Froese and Chaffee failed to warn Mr. Smart before shooting him. Construing the facts in favor of the plaintiffs, *Gutierrez*, 841 F.3d at 900, we credit Officer Froese's testimony on this point and assume neither officer warned Mr. Smart before opening fire. Even so, no clearly established law required such a warning in this situation.

The Supreme Court has held that "*where feasible*, some warning [must be] given" before an officer may constitutionally use deadly force against a suspect threatening to inflict serious physical harm. *Garner*, 471 U.S. at 11–12 (emphasis added). But the Supreme Court and this court have consistently qualified this requirement as applying only where "feasible" or "practical." *See, e.g.*, *Samuel v. City of Broken Arrow*, 506 F. App'x 751, 754 (10th Cir. 2012) (unpublished) ("Finally, it is clear that 'some warning' must be given before an officer uses deadly force if 'feasible.'" (quoting *Garner*, 471 U.S. at 11–12)); *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1321 (10th Cir. 2009) ("A warning is not invariably required even before the use of deadly force . . . .").

We have not previously had occasion to address whether officers must give a verbal warning before engaging a suspect in a situation involving, as this one did, an active shooter in a crowded public place.[12] But other courts have not required such a

---

[12] None of the cases the plaintiffs cite gives meaningful guidance to officers engaging a perceived active shooter running through a large, chaotic crowd of

warning when officers are faced with rapidly evolving circumstances involving deadly threats. *See, e.g.*, *Molina-Gomes v. Welinski*, 676 F.3d 1149, 1152–53 (8th Cir. 2012) (holding officer's decision to fire on driver without warning was objectively reasonable where driver sped backwards, dragging another officer along and knocking him to the ground); *Carr v. Tatangelo*, 338 F.3d 1259, 1269 (11th Cir. 2003) (declining to require warning where, "[i]n a split-second, rapidly escalating situation involving perceived deadly force . . . [an officer] acted in an objectively reasonable manner to the apparent imminent threat to his fellow officer to save his life"); *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) (declining "to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where, as here, such a warning might easily have cost the officer his life").

Because no relevant authority required the officers to give a warning under these circumstances, even assuming the officers failed to warn Mr. Smart before opening fire, we cannot conclude their failure to do so violated clearly established law.

## 3.  Shooting Mr. Smart After It Became Apparent He Posed No Threat

Finally, the plaintiffs argue a reasonable jury could find that Officer Chaffee violated clearly established law by shooting Mr. Smart after it became clear he posed

---

people. *See Lee v. Tucker*, 904 F.3d 1145, 1150 n.1 (10th Cir. 2018) (involving the use of a taser on an unarmed suspect during a domestic dispute); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 662–63 (10th Cir. 2010) (involving the use of a taser on a suspect who "may have had a knife and was verbally and physically non-cooperative" during a welfare check after a domestic dispute).

no threat. We agree and therefore reverse the district court's grant of summary judgment on this point with respect to Officer Chaffee.

Taking the facts in the light most favorable to the plaintiffs, a reasonable jury could conclude Officer Chaffee shot Mr. Smart after it became clear Mr. Smart no longer posed a threat. Mr. Wheaton described Mr. Smart as lying "on the ground [with] arms stretched out . . . looking back [shaking] his head . . . like I give up or something," when Officer Chaffee fired his final shots.[13] App. at 201. The plaintiffs' biomechanics expert opined Mr. Smart's bullet wounds could not have been inflicted while he was hunched forward as Officers Froese and Chaffee described Mr. Smart's posture when fleeing. Also, the plaintiffs' medical expert explained that Mr. Smart's three "shored" bullet wounds indicated he had been shot three times in the back, while on the ground. From this evidence, a reasonable jury could conclude that by the time Officer Chaffee fired his final shots, Mr. Smart was lying face down on the ground with his arms stretched out, was unarmed, and had time to "look[] back" at Officer Chaffee and shake his head. App. at 201. A reasonable jury could also

---

[13] Mr. Wheaton described the officer who fired the final shots as "tall" and "slim," and he testified he saw only Officer Froese shoot Mr. Smart. App. at 199. Based on this testimony, the officers argue it is a mischaracterization of Mr. Wheaton's testimony to take it as evidence that Officer Chaffee shot Mr. Smart after he fell. We disagree. Drawing all reasonable inferences in the plaintiffs' favor, we interpret Mr. Wheaton's testimony as referring to Officer Chaffee's actions. This is reasonable given that Mr. Wheaton did not know either officer and identifying this officer as Officer Chaffee is consistent with every other account in the record. Thus, we credit Mr. Wheaton's testimony as evidence that *an* officer fired these final shots, and we look to other witnesses' accounts to infer that that officer was Officer Chaffee.

25

conclude, based on the witnesses' testimony that they had time to perceive Mr. Smart no longer posed a threat, that Officer Chaffee likewise had the opportunity to perceive that any threat had passed by the time he fired his final shots.

We addressed a similar situation in *Fancher v. Barrientos*, 723 F.3d 1191, 1196 (10th Cir. 2013), where a suspect jumped into an officer's patrol car which contained two loaded guns. As the officer reached in and tried to remove his keys from the ignition, the suspect shifted the vehicle into reverse. *Id.* at 1196–97. The officer shot the suspect in the chest, saw the suspect slump, and concluded he had hit the suspect. *Id.* at 1197. The car began to roll backwards, so the officer stepped out of the way. But then, "five to seven seconds" later, the officer fired a second series of shots, killing the suspect. *Id.* The district court denied qualified immunity as to the second series of shots. *Id.* at 1193. We affirmed, reasoning the suspect was clearly incapacitated by the time the officer fired the second series of shots, and the officer had "enough time . . . to recognize and react to the changed circumstances and cease firing his gun." *Id.* at 1201 (alteration in original) (quotation marks omitted).

Similarly, here, the plaintiffs point to several circumstances that, if true, could have put Officer Chaffee on notice that Mr. Smart posed no threat: Mr. Smart fell to the ground, had his arms outstretched with his empty hands visible, and looked back at Officer Chaffee and shook his head. And other eyewitnesses who, just like Officer Chaffee, were in the midst of a chaotic situation, had time to perceive that Mr. Smart did not pose a threat. Therefore, a reasonable jury could conclude that Officer Chaffee violated Mr. Smart's right to be free from excessive force by firing the final

26

shots at Mr. Smart after Officer Chaffee had had "enough time . . . to recognize and react to" the fact that Mr. Smart no longer posed a threat (if in fact he ever *did* pose a threat). *Id.* (alteration in original) (quotation marks omitted).

Turning now to the second prong of qualified immunity, "it is . . . clearly established that officers may not continue to use force against a suspect who is effectively subdued." *Perea*, 817 F.3d at 1204; *see also McCoy*, 887 F.3d at 1050 n.19 ("[F]orce justified at the beginning of an encounter is not justified *even seconds later* if the justification for the initial force has been eliminated." (alteration in original) (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005))); *Herrera v. Bernalillo Cty. Bd. of Cty. Comm'rs*, 361 F. App'x 924, 929 (10th Cir. 2010) (unpublished); *Gouskos v. Griffith*, 122 F. App'x 965, 977 (10th Cir. 2005) (unpublished); *Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991).[14] Thus, taking the facts in the light most favorable to the plaintiffs, Officer Chaffee violated clearly established law if he shot Mr. Smart after it would have been clear to a reasonable officer that the perceived threat had passed.

---

[14] *Perea* and *McCoy* post-dated the events in this case, so our holdings in those cases, standing alone, could not have given the officers notice that their conduct violated clearly established law at the time of the conduct in question. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *McCoy v. Meyers*, 887 F.3d 1034, 1053 n.24 (10th Cir. 2018) ("The dispositive clearly established law inquiry is whether the *preexisting* law gave adequate notice that the complained of conduct was unconstitutional."). But both *Perea* and *McCoy* dealt with events in 2011 (that is, prior to the events in this case) and, citing case law pre-dating those events, determined that it violated clearly established law to use force against a suspect who has ceased to be a threat. *See Perea v. Baca*, 817 F.3d 1198, 1200, 1204 (10th Cir. 2016); *McCoy*, 887 F.3d at 1038, 1053 & n.24.

27

To be sure, the mere fact that a suspect has fallen and been disarmed does not necessarily mean an officer acts unreasonably by firing additional shots. *See Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) ("Within a few seconds of reasonably perceiving a sufficient danger, officers may use deadly force even if in hindsight the facts show that the persons threatened could have escaped unharmed."). Courts are particularly deferential to the split-second decisions police must make in determining precisely when a deadly threat has passed. *See, e.g.*, *id.*; *Troupe v. Sarasota Cty., Fla.*, 419 F.3d 1160, 1168 (11th Cir. 2005) ("Even if in hindsight the facts show that the SWAT Team could have escaped unharmed, a reasonable officer could [still] have perceived that [the suspect] posed a threat of serious physical harm."). If Officer Chaffee shot Mr. Smart even though in retrospect Mr. Smart no longer posed a threat, a jury might still conclude that Officer Chaffee acted reasonably: there might not have been enough time for Officer Chaffee to safely conclude that Mr. Smart posed no further threat.[15] But the evidence here, taken in the light most favorable to the plaintiffs, would also allow a reasonable jury to conclude that Officer Chaffee should have reacted to the changed circumstances and stopped shooting. Because this version of events would involve a violation of clearly

---

[15] On this note, the officers point to expert testimony about a "reactionary gap"—a delay between stimulus and response during which an officer must observe that a threat has passed, orient to the new situation, decide what to do, and then physically stop shooting at the threat. While this evidence may be relevant to a jury's determination whether Officer Chaffee acted reasonably under the circumstances, it does not inform our inquiry at the summary judgment stage into whether, "as a matter of law, . . . the risk of physical harm . . . that supported the first shot[s] still existed at the time of the [final shots]." *Harris v. Pittman*, 927 F.3d 266, 274 (4th Cir. 2019).

established law, the district court erred in granting summary judgment as to Officer Chaffee's final shots.

**B.** *Reconsideration of Supplemental Jurisdiction Over State Law Claims*

The plaintiffs argue for the first time in their reply brief that if we reverse the district court's dismissal of their § 1983 claim, we should also "direct the district court to 'reconsider its decision to decline supplemental jurisdiction over [their] state law claims.'" Reply Br. at 26 (alteration in original) (quoting *Baca v. Sklar*, 398 F.3d 1210, 1222 n.4 (10th Cir. 2005)). It is true that when we reverse a district court's dismissal of a federal law claim, we often also direct the district court to reconsider whether to exercise supplemental jurisdiction over any state law claims it dismissed along with the federal claim. *See, e.g.*, *Baca*, 398 F.3d at 1222 n.4. Here, however, the plaintiffs have waived their right to have this issue reviewed on appeal. *See In re: Motor Fuel Temperature Sales Practices Litig.*, 872 F.3d 1094, 1110 n.4 (10th Cir. 2017) ("[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief." (alteration in original) (quotation marks omitted)); *cf. United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, No. 2:99-CV-00086, 2007 WL 3053266, at *1 (D. Utah 2007) (declining to reconsider exercise of supplemental jurisdiction over state law claims where neither party requested reconsideration nor appealed the decision). Because the plaintiffs failed to raise this issue until their reply brief, and because we have only one page of cursory briefing on whether the district court *should* exercise supplemental jurisdiction over these claims, we decline to consider their request. Instead, the

29

plaintiffs are free to request reconsideration (to the extent the rules permit) in subsequent proceedings before the district court. *See* Fed. R. Civ. P. 60(b).

### III.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment as to all defendants on the first two claims of violation of constitutional rights, and as to Officer Froese and the City with respect to the third claim. But we **REVERSE** the district court's grant of summary judgment as to Officer Chaffee on Mr. Smart's claim that Officer Chaffee fired the final shots after it would have been apparent to a reasonable officer that Mr. Smart was no longer a threat, and we **REMAND** to the district court for further proceedings consistent with this decision.

*Estate of Marquez Smart, et al. v. The City of Wichita, et al.*, No. 18-3242
**BACHARACH**, J., dissenting.

Mr. Marquez Smart, a young black man, was fatally shot five times in the back by Officers Froese and Chaffee. Under the plaintiffs' version of events, Mr. Smart was unarmed and nonthreatening as he was being chased. The district court nonetheless granted summary judgment to Officers Froese and Chaffee based on qualified immunity, holding that the Constitution did not clearly prohibit

- them from shooting an unarmed and nonthreatening man or

- Officer Chaffee from shooting the man as he was lying face down on the street.

The majority reverses the second holding, but this reversal does not go far enough. The Constitution clearly prohibited both officers from shooting an unarmed individual posing no threat to anyone. I would thus reverse the grant of summary judgment to Officers Froese and Chaffee as to their use of deadly force during the chase.

## 1.     The Standards for Review and Summary Judgment

We review de novo the district court's decision to grant summary judgment on the ground of qualified immunity. *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The district court could grant summary judgment only if there was no genuine dispute of material fact and the officers were entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To make this assessment, the district court had to view the evidence and

draw all reasonable inferences in the light most favorable to the plaintiffs. *See Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016).

**2.      The Facts as Found by the District Court**

The plaintiffs' version of events was supported by the record and largely credited by the district court for purposes of summary judgment. Like the district court, I would rely on the plaintiffs' version of events.

**2.1      The Shooting**

The shooting took place in Wichita. At roughly 2 a.m., hundreds were gathered on Mosley Street. Because of the size of the gathering, the police were present. One officer (Officer Froese) started to cross the street as another officer (Officer Chaffee) stood nearby.

The sound of gunshots rang out, and most of the crowd dashed south. Mr. Smart and others ran north, and Officer Froese pursued Mr. Smart, firing gunshots along the way. Mr. Smart turned down an alley with Officer Froese continuing in pursuit. When Officer Froese closed to roughly four or five feet, he fired two or three more shots.

Officer Chaffee heard the initial shots and crossed Mosley Street to pursue Mr. Smart, shooting once. Mr. Smart fell with his arms outstretched. Officer Chaffee then shot Mr. Smart three more times. The gunshots killed him.

2



Mr. Smart was ultimately shot five times; every bullet struck him from behind. Police recovered a .45 caliber handgun from about ten feet away from Mr. Smart's head. Also nearby were a .45 caliber magazine, two .45 caliber casings, and Mr. Smart's eyeglasses. The magazine had seven cartridges, with the top one loaded backward, blocking the gun from firing.

The district court concluded that a factual dispute exists over Mr. Smart's alleged possession of a gun.[1] Another factual dispute is where the gunshots originated.

## 2.2    Where did the gunshots originate?

Some witnesses testified that the gunshots had originated in the south, where Mr. Smart had been standing. Officer Froese testified that he had heard a gunshot to his south. According to his account, Mr. Smart was holding a gun and fired two more shots. Officer Chaffee testified that he'd heard four or five gunshots, seen people running south, and seen Mr. Smart pointing a gun.

But these accounts conflict with testimony from Ms. Latyra James, who was standing near Mr. Smart when the shots were fired. Ms. James denied that the shots had come from anywhere near Mr. Smart. Her testimony creates a fact-issue on whether the gunshots originated in Mr. Smart's vicinity.

## 2.3    Did Mr. Smart have a gun?

Officers Froese and Chaffee testified that they had seen Mr. Smart with a gun. Officer Froese maintained that he had seen Mr. Smart shoot the gun into a crowd and then run away while clutching the gun. Officer

---

[1]    The district court also concluded that a factual dispute existed on whether the officers had warned Mr. Smart to drop the gun. But this factual dispute does not materially bear on the issue of qualified immunity.

Chaffee testified that he had seen Mr. Smart holding the gun with his arm outstretched (when the first shots were fired) and then running with the gun in his hand. Officer Brad Crouch also testified that he had seen Mr. Smart running with a "dark object" in his hand. Officer Crouch added that when the object went sliding down the alley, he could see that it was a handgun. A bystander, Adron Jones, also testified that he had seen Mr. Smart running with a gun in his hand.

Seven other witnesses (Sergeant Robert Gulliver, Officer Garrett Shaddix, Officer Matthew Phillips, Audras Wilson, Rolando Miller, DeShawn Wheaton, and Latyra James) testified that they had seen Mr. Smart but hadn't seen him carrying a gun. Audras Wilson and Mr. Smart were friends and had just attended a concert together. Mr. Wilson testified that he did not know of Mr. Smart owning a gun.

That testimony is supported by the absence of any physical evidence tying Mr. Smart to the gun lying near his corpse. For example, there were no fingerprints found on the gun or the magazine. The police department took swabs from the gun, and later tests excluded Mr. Smart as a DNA match for three of the samples but could not exclude him for other samples. The chief medical examiner found no gunshot residue on Mr. Smart's hands during the autopsy.

Viewing the evidence in the light most favorable to Mr. Smart, a reasonable factfinder could conclude that Mr. Smart did not have a gun.

5

**3. The Standard for Qualified Immunity**

To overcome a defendant's assertion of qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects officers from suit unless their actions reflect plain incompetence or a knowing violation of the Constitution. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). A police officer's conduct may reflect plain incompetence when "existing precedent . . . placed the . . . constitutional question beyond debate." *Id.*

**4. The Violation of a Clearly Established Right**

Viewed in the light most favorable to the plaintiffs, the evidence shows that Officers Froese and Chaffee used deadly force without a reasonable basis to believe that Mr. Smart had a gun or posed a danger to anyone. The district court and the majority thus properly acknowledge that the plaintiffs' version of events would entail a constitutional violation. But I would go further and regard this constitutional violation as clearly established.

6

### 4.1 Unreasonableness of the Officers' Alleged Mistake and Their Conduct

Officers Froese and Chaffee argue in part that any constitutional violation would not have been clearly established because any factual mistakes they might have made would have been reasonable. The majority rejects this argument because a factfinder could justifiably accept the plaintiffs' theory that the officers had acted unreasonably. I agree with this conclusion.

The district court assumed that Officers Froese and Chaffee had shot at Mr. Smart "under the mistaken perception that he was the active shooter," yet held the officers had not acted "egregious[ly]." *Estate of Smart v. City of Wichita*, No. 14-2111-JPO, 2018 WL 3744063, at *18 (D. Kan. Aug. 7, 2018). The majority frames the issue based on the reasonableness of the officers' conduct rather than its egregiousness. Framing the issue this way, the majority twice acknowledges that a factfinder could justifiably determine that the officers had acted unreasonably in identifying Mr. Smart as the shooter. Majority Op. at 19, 23. *But see id.* at 18 n.9 (stating that the "officers reasonably believed [Mr. Smart] was still carrying a gun").

It's true that factual mistakes, as well as legal mistakes, may entitle an officer to qualified immunity. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Singh v. Cordle*, 936 F.3d 1022, 1033 (10th Cir. 2019). But the

officers' alleged factual mistakes do not entitle them to summary judgment based on qualified immunity because a factfinder could appropriately conclude that those mistakes had been unreasonable.

We have frequently explained that when qualified immunity is involved, we focus on the plaintiffs' "version" of the facts. *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018); *A.M. v. Holmes*, 830 F.3d 1123, 1136 (10th Cir. 2016); *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010); *Walker v. Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006). The plaintiffs' version does not suggest a factual mistake on the part of the officers.

Despite this omission in the plaintiffs' version, Officers Froese and Chaffee urge us to affirm summary judgment based on their own version of events, arguing that if they had mistakenly concluded that Mr. Smart had been carrying a gun, the mistake would have been honest and reasonable. Such a mistake could trigger qualified immunity if a factfinder would necessarily regard the officers' mistake as reasonable. *See Singh v. Cordle*, 936 F.3d 1022, 1033 (10th Cir. 2019) ("A mistake of fact must, of course, be a reasonable one [for qualified immunity]."). But as the majority states, a factfinder could justifiably find that Officers Froese and Chaffee had acted unreasonably by shooting a nonthreatening and unarmed man as he joined hundreds of others fleeing the scene at the sound of gunshots. *See Wilkins v. Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) (stating that the

8

reasonableness of the officers' factual mistake "depends on disputed issues of material fact," which create "a question of fact best resolved by a jury" rather than "a legal inquiry").

Like the majority, I believe that a factfinder could appropriately conclude that the two officers lacked a reasonable belief that Mr. Smart had a gun or was the shooter. Officer Chaffee estimates that he was about 90–100 feet away from Mr. Smart, and Officer Froese could not even estimate how far away he was. And the incident took place at roughly 2 a.m., with the street engulfed by darkness.

Despite the distance and darkness, Officers Chaffee and Froese were so confident that Mr. Smart had a gun that they decided to fire repeatedly at him. Given these circumstances, a factfinder could reasonably determine that the two officers had wrongly assumed that Mr. Smart was armed and had been the shooter.

Officers Froese and Chaffee repeatedly fired at Mr. Smart as they chased him, guns ablazing, with hundreds of innocent bystanders fleeing up and down the street. Given the rapidly moving crowd, a factfinder could reasonably conclude that the officers had unreasonably jeopardized not only Mr. Smart but also the hundreds of others. As they scurried in darkness, a misplaced gunshot could have killed someone else in the crowd. As one expert witness testified:

9

> The record in this case is clear the time of this incident there were anywhere from 200–500 persons in the street following the concerts had recently let out. So, even if it is to be believed that Marquez Smart possessed a firearm as he ran through the crowd, due to the immense number of innocent citizens in the immediate area, it would be completely unreasonable for officers to discharge their weapons realizing that it would likely result in innocent bystanders being seriously injured or even killed.

Doc. 188-2 at 15. Indeed, Officers Froese and Chaffee shot not only Mr. Smart but also four others (Darel Lucas, Rashayla Hamilton, Latyra James, and Tationa Nolen).

In analogous circumstances, other federal appellate courts have disallowed summary judgment because of factual disputes over the reasonableness of an officer's mistake. For example, the Ninth Circuit Court of Appeals addressed a similar issue in *Cruz v. City of Anaheim*, 765 F.3d 1076 (9th Cir. 2014). There five police officers shot a suspect, with four officers explaining later that they had seen the suspect reach for his waistband even though he was not carrying a gun. *Cruz*, 765 F.3d at 1080. The Ninth Circuit explained that for qualified immunity purposes, the court had to consider the consistency of the officers' version with other known facts. *Id.* Inconsistencies between those facts and the officers' version led the Ninth Circuit to conclude that a factfinder could have found that the police officers had lied. *Id.*

The Sixth Circuit took a similar approach in *Floyd v. Detroit*, 518 F.3d 398 (6th Cir. 2008). There a police officer had shot an unarmed man,

10

but urged qualified immunity based on a mistaken belief that the victim had shot a fellow officer. *Floyd*, 518 F.3d at 401. The Sixth Circuit held that the police officer was not entitled to summary judgment based on qualified immunity because the assertion of "an honest but mistaken belief . . . does little to resolve the key issue of whether his belief and subsequent actions were nonetheless objectively reasonable." *Id.* at 408.

The Eighth Circuit embraced a similar view in *Wealot v. Brooks*, 865 F.3d 1119 (8th Cir. 2017). There the victim fired a gun before discarding it. *Wealot*, 865 F.3d at 1123. Two police officers then shot the victim, thinking that he was still armed. *Id.* The Eighth Circuit reversed the grant of summary judgment to the officers, holding that a reasonable factfinder could regard the police officers' mistake as unreasonable given conflicting testimony about the distance of the victim's gun from his body. *Id.* at 1128.

As in *Cruz*, *Floyd*, and *Wealot*, the summary-judgment record reflects contested facts bearing on the reasonableness of the police officers' asserted belief that Mr. Smart was the shooter and was wielding a gun as he ran. A witness testified that the gunshots had not come from the area where Mr. Smart was standing, seven witnesses said that they hadn't seen Mr. Smart with a gun, and forensic evidence did not link Mr. Smart to the gun that was found.

These facts "would certainly cast doubt on the officers' credibility" and could reasonably lead to a finding "that the officers [had] lied." *Cruz v. City of Anaheim*, 765 F.3d 1076, 1080 (9th Cir. 2014); *see also Fernandez v. Leonard*, 784 F.2d 1209, 1213–14, 1216–17 (1st Cir. 1986) (holding that a police officer was not entitled to summary judgment based on qualified immunity because the facts, when viewed favorably to the plaintiffs, "would admit a finding that for some reason defendant deliberately shot an unarmed man three times"). Or, perhaps, a factfinder might assume that the police officers had committed an honest mistake. But "not all mistakes—even honest ones—are objectively reasonable." *Floyd v. Detroit*, 518 F.3d 398, 408 (6th Cir. 2008). Given the darkness and hundreds galloping in different directions, a factfinder could justifiably question the reasonableness of the officers' mistake and their decision to keep firing at Mr. Smart as they chased him.

## 4.2   Consideration of Our Precedents

The majority acknowledges that a factfinder could regard the officers' mistakes as unreasonable. The majority nonetheless concludes that the plaintiffs failed to identify a precedent involving an active shooter. I respectfully disagree with the majority's reasoning and conclusion.

Qualified immunity does not protect officers when the underlying "right's contours were sufficiently definite that any reasonable official in

the [officer's] shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). In my view, any reasonable official would have understood the illegality of unreasonably shooting a person who is unarmed, nonthreatening, and running away. The illegality is apparent from three precedents:

1.  *Tennessee v. Garner*, 471 U.S. 1 (1985),

2.  *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003), and

3.  *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006).[2]

**4.2.1 *Tennessee v. Garner***

In *Tennessee v. Garner*, the police shot an unarmed man as he fled the scene of a burglary. 471 U.S. 1, 3 (1985). The Supreme Court held that

> deadly force to prevent the escape of an apparently unarmed suspected felon . . . may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

*Id.* at 3.

---

[2]     Mr. Smart did not present this case law when arguing the clearly established prong in district court. But "appellate review of qualified immunity dispositions is to be conducted in light of all relevant precedents, not simply those cited to, or discovered by, the district court." *Elder v. Holloway*, 510 U.S. 510, 512 (1994). So we must consider these opinions.

### 4.2.2 *Carr v. Castle*

We applied *Garner* in *Carr*, where officers had shot at the backside of a suspect. *Carr v. Castle*, 337 F.3d 1221, 1225 (10th Cir. 2003). A factual dispute existed over what had prompted the shots. The officers maintained that the suspect had been wielding a large piece of concrete, but a witness reported that the suspect had already thrown the piece of concrete by the time that he was shot. *Id.* at 1225. Considering the plaintiff's version of the facts, we held that the law had clearly prohibited the use of deadly force after the victim had thrown the concrete and no longer posed a threat. *Id.* at 1227–28.

### 4.2.3 *Walker v. City of Orem*

In *Walker v. City of Orem*, the police shot a suicidal man who was holding a knife to his own wrist without threatening others. 451 F.3d 1139, 1158–60 (10th Cir. 2006). The parties disputed whether the officers had warned the man to drop the knife or could reasonably have believed that the weapon was a gun. *Id.* We held that the "[p]laintiff's version of the facts shows the violation of a clearly-established constitutional right." *Id.* We reasoned that the Constitution clearly prohibited the use of deadly force when an officer "had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him." *Id.* at 1160 (citing

14

*Zuchel v. City & County of Denver*, 997 F.2d 730, 735–36 (10th Cir. 1993)).

### 4.3 Violation of a Clearly Established Right Based on These Precedents

When read together, *Garner*, *Carr*, and *Walker* clearly establish the unlawfulness of shooting a person who does not present a reasonable threat to the safety of officers or the public. In all three cases, the officers shot someone who was neither wielding a gun nor threatening anyone's safety. And *Carr* specifically noted that the violation was clearly established when the suspect had been shot multiple times, with all bullets entering the back of the body. *Carr v. Castle*, 337 F.3d 1221, 1227–28 (10th Cir. 2003).

Viewed favorably to the plaintiffs, the evidence shows that Officers Froese and Chaffee shot an unarmed man in the back multiple times even though he was unarmed and non-threatening. A reasonable officer would have known that this conduct violated a clearly established right under *Garner*, *Carr*, and *Walker*. Given these precedents, the sound of gunshots would not have caused reasonable police officers to think that they could unreasonably identify someone in the crowd as the shooter, chase him, and repeatedly fire at him in darkness as hundreds of others fled.

The majority distinguishes *Garner*, *Carr*, and *Walker*, reasoning that they did not involve an active shooter. But the label "active shooter" is problematic. An "active shooter" is "an individual [who] is actively

15

engaged in killing or attempting to kill people with a firearm in a confined, populated area." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of New Jersey*, 910 F.3d 106, 110 (3d Cir. 2018). This definition arguably did not fit the situation when the officers opened fire on Mr. Smart. Officer Froese had thought that there were three shots; Officer Chaffee had thought that he heard four or five shots. But a factfinder could reasonably infer that once the gunshots began, the only gunshots had come from the officers rather than someone in the crowd.[3] Given the reasonableness of this inference, the factfinder could justifiably find that the unknown shooter was no longer "active" by the start of the chase.

Irrespective of the label "active shooter," the majority concedes that a factfinder could justifiably find that the officers had unreasonably decided that Mr. Smart had a gun and that he had been the shooter. Given these concessions, how could reasonable police officers believe that the Constitution would permit them to fatally shoot someone without a reasonable belief that he had a gun, that he had been the shooter, or that he

---

[3]     The majority relies on the testimony of Ms. James, who stated that "the gunshots just kept getting closer and closer." Majority Op. at 23 n.11 (quoting Appellants' App'x at 271–72). But this testimony could reasonably refer to the gunshots that came from the officers. After all, the two officers do not dispute that Ms. James had been shot by the police rather than someone in the crowd. *See, e.g.*, Appellants' App'x at 191 (Officer Froese's testimony that he could have been the person that had shot the female running behind Mr. Smart). A factfinder could thus reasonably infer that Ms. James had heard gunfire from the police, not someone in the crowd.

16

had done anything wrong? In my view, *Garner*, *Carr*, and *Walker* clearly establish that the Constitution does not permit a police officer to shoot a defenseless suspect without a reasonable belief that he was armed, that he was dangerous, or that he had committed *any* crime.

* * *

A genuine factual dispute exists on the reasonableness of the officers' factual mistakes and their conduct. Because unreasonably chasing and shooting an unarmed person violates a clearly established constitutional right, I would reverse the award of summary judgment for Officer Froese and Officer Chaffee as to the use of deadly force during the chase.