# United States Court of Appeals
### For the Eighth Circuit

_____

No. 16-1192

_____

Anna M. Wealot, individually and as Natural Mother and Lawful Heir of Waylen
Wealot, deceased

*Plaintiff - Appellant*

v.

Alvin Brooks, Member, Kansas City Board of Police Commissioners; Chief Darryl
Forte; Michael Kilgore, Member, Kansas City Board of Police Commissioners;
Angela Wasson-Hunt, Member, Kansas City Board of Police Commissioners;
Michael Rader, Member, Kansas City Board of Police Commissioners; Mayor Sly
James, Member, Kansas City Board of Police Commissioners; David Kenner,
Member, Kansas City Board of Police Commissioners; Officer Megan Gates;
Officer Kevin Colhour

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: November 15, 2016
Filed: August 4, 2017

_____

Before RILEY,[1] Chief Judge, WOLLMAN and KELLY, Circuit Judges.
_____

RILEY, Chief Judge.

Waylen Wealot was shot approximately ten times and killed by two Kansas City, Missouri, police officers. Waylen's mother, Anna Wealot, brought this action against the two officers, the chief of police, and members of the board of police commissioners, alleging excessive force in violation of the Fourth Amendment and wrongful death under state law. The district court granted summary judgment to the defendants. Having jurisdiction under 28 U.S.C. § 1291, we affirm in part and reverse in part.

## I.      BACKGROUND

The following facts are recited in the light most favorable to the non-moving party. See Stoner v. Watlingten, 735 F.3d 799, 802 (8th Cir. 2013). On March 29, 2013, Kansas City police officers Megan Gates and Kevin Colhour responded to a call from the police dispatch requesting service relating to a disturbance at Waylen Wealot's residence, located at 4014 East 11th Street.[2]

When the officers arrived at Waylen's residence, Kelsie Rosewicz, Waylen's girlfriend (who lived at the house with Waylen), and Fred Wealot, Waylen's older

_____

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

[2]Because the physical location of the residence becomes relevant, we briefly describe it to the best of our ability. Waylen's house sits on the second lot from the northeast corner of the intersection of 11th Street and Myrtle Street. Eleventh Street runs east and west. Myrtle Street runs north and south. Waylen's house is on the north side of the street, facing south. Directly west of Waylen's house, in the corner lot, is an empty field.

brother, were standing outside. Rosewicz and Fred told the officers no one there had called the police, and they suggested the caller was probably one of the Lees, their neighbors up the block. Fred and Levi Lee had been fighting over a girlfriend, Mary Holmes, and the fight had escalated into a feud between the families. During this conversation, Waylen emerged from inside the house and began yelling at the officers. Rosewicz told Waylen to go back inside, which he did. Officers Gates and Colhour got into their patrol car and drove around the corner to the Lee residence at 1022 Myrtle Street. The Lee residence is located three lots north of the intersection at 11th and Myrtle Street and sits on the west side of the street. It is approximately 300 feet away from the Wealot residence.

Meanwhile, Levi Lee, driving a gold minivan carrying a group of people, pulled up near Waylen's residence, stopping at the intersection of 11th and Myrtle. Levi and Holmes, Fred's ex-girlfriend, exited the minivan and began shouting at Waylen, Fred, and Rosewicz, who again were standing outside of Waylen's house. Levi got back inside the minivan and drove it toward Rosewicz, jumping the curb. Waylen went inside his house to get a gun. When Waylen came back outside, he fired multiple shots in the direction of the minivan before taking off running toward his backyard. Waylen threw his gun along the west side of his house as he ran.

The officers were talking with a neighbor of 1022 Myrtle when they heard gunshots and observed Waylen fire two or three rounds at the gold minivan. With her firearm drawn, Officer Gates began to pursue Waylen on foot, crossing Myrtle Street to cut through the empty lot on the corner, directly west of Waylen's house. Running ahead of Officer Colhour, who was following behind, Officer Gates cut through the empty lot to catch Waylen as he ran north along the west side of his house toward the backyard. Officer Gates was about four to six feet behind Waylen when, as Waylen

turned, she began to shoot.[3]  Officer Gates shot Waylen eight times, continuing to shoot as Waylen collapsed to the ground.  Officer Gates stood only three to four feet away from Waylen's body as she fired her last shot.  Officer Colhour, standing a few feet behind Gates, shot twice.  Waylen's gun was recovered five to seven feet away from his body.

Anna Wealot (Wealot), mother and heir of Waylen, brought these claims alleging excessive force in violation of the Fourth Amendment and wrongful death under state law.  See 42 U.S.C. § 1983; Mo. Rev. Stat. § 537.080.  The defendants moved for summary judgment.  See Fed. R. Civ. P. 56(a).  The district court held the officers were entitled to qualified immunity because no reasonable jury could find the officers' use of force against Waylen was objectively unreasonable.[4]  Because Waylen

---

[3]The parties dispute whether the officers gave any warning to Waylen and whether they saw Waylen drop the gun, as well as Waylen's movements and the position of his hands in the moments before the officers shot him.

[4]All parties have treated the claims against Officer Gates and Officer Colhour as having been brought against them in their individual capacities.  From our review of the pleadings, we are unable to discover any clear allegation of the capacity in which the two officers were sued.  We previously held that when "a plaintiff's complaint is silent about the capacity in which she is suing the defendant," the claims should be treated as "only official-capacity claims."  Egerdahl v. Hibbing Cmty. Coll., 72 F.3d 615, 619 (8th Cir. 1995).  The rule is different in other circuits.  See Baker v. Chisom, 501 F.3d 920, 926-27 (8th Cir. 2007) (Gruender, J., dissenting); see, e.g., Powell v. Alexander, 391 F.3d 1, 22 (1st Cir. 2004) ("Notwithstanding the concerns reflected in the Eighth Circuit's analysis, the other circuits have, with virtual unanimity, adopted the 'course of proceedings' test as the better approach." (footnote omitted)); Biggs v. Meadows, 66 F.3d 56, 61 (4th Cir. 1995) ("[W]hen a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity. . . . [An] indication that suit has been brought against a state actor personally may be a plaintiff's request for compensatory or punitive damages, since such relief is unavailable in official capacity

suits. . . . The nature of any defenses raised in response to the complaint is an additional relevant factor."). We have continued to apply our more stringent pleading rule, and in one instance even done so when the parties and district court ignored the capacity issue in the first instance. See Remington v. Hoopes, 611 F. App'x 883, 884-85 (8th Cir. 2015) (per curiam) (unpublished). There are several reasons we refrain from doing the same here.

First, although we have referenced the Eleventh Amendment's jurisdictional limit in support of our stringent pleading rule, see Murphy v. State of Ark., 127 F.3d 750, 754-55 (8th Cir. 1997), this complaint's failure to abide by our judicially created rule does not deprive us of subject matter jurisdiction so that we are compelled to dismiss. See Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 528 n.13 (1982) (Powell, J., dissenting) ("Unlike other limitations on federal jurisdiction, the limitation imposed by the Eleventh Amendment and the doctrine of sovereign immunity may be waived by consent unequivocally expressed."); cf. Biggs, 66 F.3d at 60 ("Eleventh Amendment immunity is not truly a limit on the subject matter jurisdiction of federal courts, but a block on the exercise of that jurisdiction."). This is especially true given only municipal actors—as opposed to state—are involved. See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391, 401 (1979) ("[T]he Court has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities."); Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 701 (1978) (holding municipalities "sued under § 1983 cannot be entitled to an absolute immunity").

Second, despite the complaint's imperfections, every party involved in this case proceeded with the understanding that the claims against Officer Gates and Officer Colhour were brought individually, thus negating any concerns about whether the defendants were on notice or prejudiced. Cf. Remington, 611 F. App'x at 885 (reviewing the facts and allegations in the complaint to determine whether the defendants had been provided with "sufficient notice of an individual-capacity suit"). This understanding appears to have begun when the defendants raised qualified immunity in their answer to the Wealot complaint, see Doe v. Cassel, 403 F.3d 986, 988-89 (8th Cir. 2005) (declaring particularized pleading important, in part, because it allows defendants to "mount a qualified immunity defense early in litigation"), and has continued through this appeal and oral argument, without either party raising the

had not suffered a constitutional deprivation, the district court granted summary judgment to the other defendants on the excessive force claims. Finding official immunity barred Wealot's state wrongful death claims, the district court also granted summary judgment on those claims. Wealot appeals.

## II. DISCUSSION

### A. Standard of Review

Summary judgment shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review de novo the district court's grant of summary judgment, viewing the evidence in the light most favorable to the non-moving party. See Stoner, 735 F.3d at 802.

---

issue once, cf. Remington, 611 F. App'x at 885 (noting the issue was at least raised at oral argument).

Third, given the disputed facts we identify below, we think it unwise to decide the case based on unraised capacity grounds without first giving Wealot the opportunity to request amending her complaint and the district court to address the issue in the first instance. See Wood v. Milyard, 566 U.S. 463, ___, 132 S. Ct. 1826, 1834 (2012) ("For good reason, appellate courts ordinarily abstain from entertaining issues that have not been raised and preserved in the court of first instance. . . . That restraint is all the more appropriate when the appellate court itself spots an issue the parties did not air below, and therefore would not have anticipated in developing their arguments on appeal."); Murphy, 127 F.3d at 755 ("Given the district court's conclusion that defendants had sufficient notice they were being sued in their personal capacities, we are confident that the district court would grant Murphy leave to amend the complaint to state personal-capacity equal protection claims if we remanded for consideration of that issue."); see also Doe, 403 F.3d at 989 ("The district courts retain all tools available under the Federal Rules of Civil Procedure to eliminate meritless claims early in the litigation process."). On remand, the district court may, at its discretion, allow Wealot to amend her complaint to reflect the course of these proceedings. See Fed. R. Civ. P. 15(a)(2).

## B.     Section 1983 Claims

Qualified immunity protects government officials from incurring civil liability as long as "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  To overcome the shield of qualified immunity, a plaintiff's claim must state a violation of a clearly established federal right, and that right must have been clearly established at the time of the violation.  See Nord v. Walsh County, 757 F.3d 734, 738 (8th Cir. 2014).  Under either prong of the inquiry, the district court "may not resolve genuine disputes of fact" relevant to the issue of qualified immunity.  Tolan v. Cotton, 572 U.S. ___, ___, 134 S. Ct. 1861, 1866 (2014) (per curiam); see also Rohrbough v. Hall, 586 F.3d 582, 587 (8th Cir. 2009).

The Fourth Amendment protects individuals against law enforcement's use of unreasonable force during seizure.  See Graham v. Connor, 490 U.S. 386, 394 (1989).  Wealot has alleged that when the officers forcefully seized, shot, and killed Waylen, they violated his right to be free from excessive force.  The defendants agree Waylen was seized, but contend the officers' infliction of deadly force was reasonable under the circumstances.  Deciding whether the inflicted force was reasonable requires balancing "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect] [was] actively resisting arrest or attempting to evade arrest by flight."  Id. at 396.  "'Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.'"  Brosseau v. Haugen, 543 U.S. 194, 203 (2004) (quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985)).  Under such circumstances, "deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."  Garner, 471 U.S. at 11-12; see also Capps v. Olson, 780 F.3d 879, 886 (8th Cir. 2015).  "At least since Garner was decided . . . , officers have been on notice that

they may not use deadly force unless the suspect poses a significant threat of death or serious physical injury to the officer or others." Craighead v. Lee, 399 F.3d 954, 962 (8th Cir. 2005).

In this case, the district court determined no rational jury could find the officers' actions unreasonable based on the "rapidly-evolving circumstances with which [the officers] were presented." Having reviewed the record in the light most favorable to Wealot, we hold summary judgment was granted in error.

Before the reasonableness of the officers' conduct can be assessed, two genuine disputes of material fact must be resolved: (1) whether the officers saw Waylen throw his gun and therefore knew he was unarmed, and (2) whether Waylen was turning around to the officers with his hands raised to surrender. See Tolan, 572 U.S. at ___, 134 S. Ct. at 1868 ("[G]enuine disputes are generally resolved by juries in our adversarial system."); Ribbey v. Cox, 222 F.3d 1040, 1043 (8th Cir. 2000) ("The question that we must answer, then, is whether a genuine question of material fact exists regarding whether [the officer's] actions—as defined by the plaintiff's version of the events—were objectively reasonable."); Gainor v. Rogers, 973 F.2d 1379, 1385 (8th Cir. 1992) ("Once a genuine issue of material fact is found to exist, the defense of qualified immunity shielding the defendant from trial must be denied.").

Relevant to our purpose are the district court's following findings:

> The officers saw Waylen fire a gun two or three times at [Levi's] van as well as in the general direction of the officers. The officers ran towards the Wealot residence. The officers saw Waylen running with a gun. Neither officer saw Waylen drop the gun. Waylen turned toward the officers with his hands bent at his waist. The officers were six to ten feet away from Waylen when they fired.
>
> . . . .

Although Ms. Wealot argues that whether the officers saw Waylen throw the gun is disputed, she has not presented facts that contradict what the officers reasonably viewed from their perspectives. Specifically, while the officers were running after Waylen, their views of him were from different angles and directions than those of Fred Wealot and Ms. Rosewicz. In addition, according to Fred Wealot, when Waylen threw his gun away, the officers' views of him would have been obscured by a tree and brush.

First, the district court found that "in the very brief ten seconds at issue, neither officer observed Waylen drop his gun." Although Rosewicz and Fred saw Waylen throw his gun along the side of the house, the district court assumed the officers did not because Rosewicz and Fred witnessed the events "from different angles and directions." This is an impermissible inference of fact. The fact that Rosewicz, Fred, and the officers all witnessed the events from different angles does not imply they could not have witnessed the same events. For example, Rosewicz was running toward Waylen and was about five feet behind the officers when she saw Waylen throw the gun and "turn[] around with his hands up." Fred acknowledged there was a tree and bush near the west side of Waylen's residence, but the presence of that particular landscaping does not necessarily prove it would have blocked the officers' views of Waylen dropping his weapon. Even though Officer Gates testified she never saw Waylen drop his gun, she also stated she never lost sight of Waylen during her pursuit. Fred testified Officer Gates must have seen Waylen drop the gun because as soon as she was done shooting, she pointed to Officer Colhour the exact spot where Waylen's gun was found.

The defendants agree that when Waylen turned toward the officers he "was unarmed and surrendering with his hands bent up at his sides," but they contend the officers still could have "reasonably believed Waylen was still armed and turning to shoot them." The defendants compare the facts here to Loch v. City of Litchfield, in which we affirmed the grant of qualified immunity to a police officer who shot an unarmed suspect moving toward the officer with his "hands raised above his head or

-9-

extended out to his sides." Loch v. City of Litchfield, 689 F.3d 961, 964 (8th Cir. 2012). In Loch, however, the plaintiffs acknowledged that the officer could not have seen the suspect discard his gun because he did so before the officer arrived. See id. at 966. Wealot has demonstrated a genuine dispute as to whether the officers *could* have seen or actually did see Waylen throw the gun as they pursued him. See Wallace v. City of Alexander, 843 F.3d 763, 769 (8th Cir. 2016) (affirming the denial of qualified immunity where a jury "could reasonably conclude that [the suspect] no longer posed a significant threat after he had discarded the gun and begun to flee").

Second, the district court found that Waylen's hands were not up in the air as he turned to face the officers. Cf. Wilson v. City of Des Moines, 293 F.3d 447, 452 (8th Cir. 2002) ("The manner in which [the suspect] turned seems . . . to be the most important fact in the series of events that led to [his] death, as it reveals the most about the level of threat he posed to the officers."). Yet, Rosewicz testified Waylen was turning around with his hands up. See Rahn v. Hawkins, 73 F. App'x 898, 901 (8th Cir. 2003) (per curiam) (unpublished) (holding "the law was clearly established that using deadly force against a suspect who was attempting to surrender . . . exceeded the Fourth Amendment's objective-reasonableness standard"). The officers' testimony on this point is inconsistent. Cf. Malone v. Hinman, 847 F.3d 949, 952 (8th Cir. 2017) (acknowledging the district court's finding that the officers' "inconsistent testimony about whether [the suspect] turned to fire at [the officer]" was "'disconcerting'"); Wilson, 293 F.3d at 454 ("Because of the internal discrepancies and variations in the officers' testimony, among other things, there remain factual issues in dispute that prohibit a grant of summary judgment."); Ludwig v. Anderson, 54 F.3d 465, 473-74 & n.9 (8th Cir. 1995) (reversing the grant of summary judgment on the basis of qualified immunity where "the depositions of the officers [we]re internally inconsistent on several points," including whether the suspect was moving toward the police at the time of the shooting).

Initially, Officer Gates stated in her deposition that she saw Waylen holding a gun as he turned toward her—"[Waylen] starts rotating his body towards us and the

*gun is at his waist height* in front of him." (Emphasis added).[5] Later, after her lawyer's questioning, she revised her testimony upon plaintiff's counsel's reexamination:

> Q:    I'm a little confused. I believe you testified earlier that when he was turning you saw his right hand at his waist; is that correct?
> A:    Yes, sir.
> Q:    Okay. You didn't see the gun, though.
> A:    No, sir.
> Q:    You saw his right hand at his waist.
> A:    When he was running I —
> Q:    . . . You testified when he was turning he had his right hand at his waist.
> A:    His right arm at his side.
>
> . . . .
>
> Q:    So your testimony before our break was that you saw his right hand, you didn't see the gun, and your testimony after our break is now you never saw his right hand; is that correct?
> A:    Yes, sir.

_____

[5]Officer Gates's testimony about the gun, at first, was quite specific, explaining:

> A:    I observe him running with the gun, black handgun in his right hand. And I don't lose sight of him at any point. During my pursuit I am telling him to "Drop the gun, drop the gun," repeatedly. He didn't stop at any point. On the west side of the residence I'm essentially intersecting him and he begins to turn towards me.
>
> . . . .
>
> Q:    With the gun still in his hand?
> A:    Yes.

-11-

Officer Colhour claims that before he started firing, he saw Waylen holding the firearm as Waylen turned and "raise[d] the gun up at [the officers]." When asked if Waylen was standing at the time they began shooting, Officer Colhour testified Waylen "was mid-run when it all happened." Describing Waylen's movements before the shooting, he stated:

> A: He was running, he turns, we — we shoot, then he does like, one, two more steps and starts to go down. Whether he turned at some point or turned all the way around, I don't know what happened. . . . He turned some way. I don't know how. I don't recall how that happened.
> Q. Okay. And what happens to the gun when you're — when you're shooting him?
> A: From my angle where I was at, as he starts to take his couple more steps his arm comes down and I see the gun come out of his hand right before he hits the ground.
> Q: And how far did the gun go from him?
> A: One to 2 feet away.

Officer Gates testified the gun was found five to seven feet away from his body, and admitted that by the time she finished shooting, she was closer to Waylen than he was to his gun.

In many cases, we have affirmed the grant of qualified immunity to officers who applied deadly force to an unarmed suspect because we concluded the officers held a reasonable belief the suspect was dangerous. See Ngo v. Storlie, 495 F.3d 597, 603 (8th Cir. 2007) (collecting cases). "An act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." Loch, 689 F.3d at 966; cf. Thompson v. Hubbard, 257 F.3d 896, 899 (8th Cir. 2001) (explaining an officer is not legally required "to wait until he sets eyes upon the weapon before employing deadly force to protect himself"). Yet, "the record here does not conclusively establish the reasonableness of the officer[s'] actions."

Craighead, 399 F.3d at 963. The officers' key testimony about the gun is controverted by other witnesses, some of their own inconsistent statements, and some physical evidence.

Wealot has sufficiently demonstrated there are at least two genuine disputes of material fact.[6] Cf. Thompson, 257 F.3d at 900; Gainor, 973 F.2d at 1387. Disputed factual issues and conflicting testimony should not be resolved by the district court. See Capps, 780 F.3d at 885 (holding for the purpose of qualified immunity a jury may find unreasonable an officer's mistaken belief that the suspect was armed); Coker v. Ark. State Police, 734 F.3d 838, 843 (8th Cir. 2013) ("Making credibility determinations or weighing evidence in this manner is improper at the summary judgment stage, and it is not our function to remove the credibility assessment from the jury." (citation omitted)).

We reverse the dismissal of Wealot's excessive force claims against Officers Gates and Colhour and remand for further consideration. In light of our decision, we

---

[6]Wealot also contends whether the officers adequately warned Waylen before using deadly force is in dispute. See Garner, 471 U.S. at 11-12. Officer Gates testified she and Officer Colhour both yelled, "Drop the gun, drop the gun" as they approached Waylen. But Rosewicz and Fred maintain the officers said nothing. Relying on Loch, the district court concluded Waylen was sufficiently "'on notice that his escalation of the situation would result in the use of the firearm.'" (Quoting Loch, 689 F.3d at 967). But in Loch, the officer "repeatedly ordered [the suspect] to get on the ground." Loch, 689 F.3d at 967. Instead of doing so, the suspect continued to move toward the officer, which we found reasonably could have been interpreted by the officer as resistance. See id. at 966. We held that "[t]he lack of a *more specific* warning [did] not render [the officer's] use of force unreasonable"—not that no warning was required at all. Id. at 967 (emphasis added); see also Estate of Morgan v. Cook, 686 F.3d 494, 498 (8th Cir. 2012) (holding the suspect "should have been on notice" that the use of deadly force was imminent where it was undisputed the police officer ordered the suspect to drop his weapon "anywhere from 2 to 15 times" (citation omitted)).

-13-

restore for the district court's consideration Wealot's claims against the chief of police and the members of the board of police commissioners. See Moore v. City of Desloge, 647 F.3d 841, 849 (8th Cir. 2011) (emphasizing we have "'consistently recognized a general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim'" (quoting McCoy v. City of Monticello, 411 F.3d 920, 922 (8th Cir. 2005))).

### C. Wrongful Death Claims

Missouri's doctrine of official immunity applies to wrongful death claims under Missouri law. See Seiner v. Drenon, 304 F.3d 810, 813 (8th Cir. 2002). The doctrine of official immunity "protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." Southers v. City of Farmington, 263 S.W.3d 603, 610 (Mo. 2008). The use of force is a discretionary duty. See Green v. Denison, 738 S.W.2d 861, 865 (Mo. 1987) ("Discretion and judgment are synonymous. It is hard to imagine a setting more demanding of judgment than one in which line officers of the police department confront a person who has recently flourished a gun."), abrogated on other grounds by Davis v. Lambert-St. Louis Int'l Airport, 193 S.W.3d 760 (Mo. 2006). "Police officers are not liable for negligent acts that are related to discretionary functions. . . . But official immunity does not apply to discretionary acts done in bad faith or with malice." Blue v. Harrah's N. Kan. City, LLC, 170 S.W.3d 466, 479 (Mo. Ct. App. 2005).

A finding of malice requires "conduct which is so reckless or wantonly and willfully in disregard of one's rights that a trier of fact could infer from such conduct bad faith or any improper or wrongful motive." State ex rel. Twiehaus v. Adolf, 706 S.W.2d 443, 447 (Mo. 1986) (citation omitted). Acting with malice requires an "actual intent to cause injury." Id. A finding of bad faith "'embraces more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious

-14-

wrongdoing, [or] breach of a known duty through some ulterior motive.'" Id. (quoting Catalina v. Crawford, 483 N.E.2d 486, 490 (Ohio Ct. App. 1984)).

Referring to its analysis of Wealot's federal claims, the district court concluded Wealot failed to produce evidence "that the officers or Chief Forte acted in bad faith or with malice." Wealot argues the officers acted in bad faith by shooting Waylen when he was unarmed and continuing to shoot him after any perceived threat had dissipated. Wealot also asserts the officers' treatment of Waylen during their initial encounter demonstrates the officers were "acting on their anger and in a malicious manner." The defendants concede Officer Colhour told Waylen to "'shut the f. up,'" and Officer Gates treated Waylen rudely. But they argue these reactions only evince their "frustration" with Waylen's "repeated interruptions." Without endorsing such conduct, we consider it in context. As the officers spoke with Fred and Rosewicz, it was Waylen who came outside and initiated the verbal confrontation with the officers. Later, Waylen escalated the confrontation with Lee by firing a round of gunshots at the minivan Lee was driving, and then Waylen took off with his gun in hand. The evidence also indicates Waylen was shooting in the direction of the minivan, which was not far from the officers' location. Even if a factfinder were to conclude the officers' beliefs that Waylen posed an immediate threat were mistaken or unreasonable, or that the officers behaved negligently or recklessly, under these circumstances, we agree there is insufficient evidence for a rational jury to conclude the officers acted with malice or in bad faith.

## III.    CONCLUSION

We affirm the district court's grant of summary judgment and dismissal of the state wrongful death claims. Because at least two genuine disputes of material fact must be resolved to determine whether the officers' conduct was reasonable, we reverse the grant of summary judgment on the excessive force claims against all defendants and remand to the district court for further proceedings consistent with this opinion.

-15-

WOLLMAN, Circuit Judge, concurring.

I concur in all but footnote 4 of the opinion. Our circuit's requirement of a clear statement that a defendant is being sued in an individual capacity may represent "a lonely position" on the issue, but it is one that must be addressed to the court en banc. Baker v. Chisom, 501 F.3d 920, 924 n.2 (8th Cir. 2007). I would treat the defendants' failure to raise the issue as constituting their *sub silentio* acquiescence in an unexpressed motion to amend the complaint and then deem the complaint to be correspondingly amended. Cf. Murphy v. State of Ark., 127 F.3d 750, 755 (8th Cir. 1997).

―――――――――――――――――――