# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2045
_____

Antoinette Liggins, individually and on behalf of B.C., a minor; B.C., a minor,
next friend Antoinette Liggins,

*Plaintiffs - Appellees*,

v.

Officer Michael Cohen, individually,

*Appellant*,

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 15, 2020
Filed: August 21, 2020

_____

Before COLLOTON, SHEPHERD, and ERICKSON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Antoinette Liggins, on behalf of herself and her minor son, sued police officer
Michael Cohen under 42 U.S.C. § 1983, alleging that he used excessive force in
seizing the son, whose initials are B.C. The case involves a shooting: Cohen, in the

line of duty, shot B.C., who was carrying a stolen gun, on July 11, 2015. B.C. sustained serious injuries and is paralyzed below the waist. The question is whether Cohen's use of force was reasonable or, if not, whether he is entitled to qualified immunity. The district court, describing it as "a close case," denied Cohen's motion for summary judgment. Cohen brings an interlocutory appeal, and we conclude that the seizure was not unreasonable, so we reverse.

I.

The incident occurred after a citizen called 911 and reported to police that B.C.'s brother, whose initials are A.C., had stolen her .40 caliber pistol the night before. A.C. was fifteen years old; B.C. was sixteen. The caller reported that A.C. possessed the stolen weapon at an apartment complex located on Hodiamont Avenue in St. Louis. She said that A.C. was wearing a red hoodie and blue shorts and was standing in the breezeway of one of the apartment buildings at the complex.[1]

The apartment building included a breezeway between the front and back of the property. In the rear, a sidewalk led straight out from the breezeway. On the left of the sidewalk was a parking lot; on the right was a playground. In the distance, forward and behind the playground, was a fence. There was a hole in the fence large enough for a person to pass through.

Cohen was one of five officers who responded to the call. Cohen knew of A.C. and B.C. from a recent carjacking investigation during which he saw surveillance video of the brothers occupying the stolen vehicle. He also was familiar with the apartment complex and what the district court described as "a history of violent

---

[1]The caller also told the 911 operator that when her friend attempted to retrieve the gun from A.C. after he stole it, A.C. pointed the gun at the friend and tried to shoot him. The record on appeal, however, does not show that the officers received this information before responding to the call.

activity" there. He knew that it was common for people to flee when police arrived at the complex, and he was aware that some used the hole in the fence behind the buildings to evade the cops.

Based on this information, the officers decided that two of them would approach the front of the complex, and that Cohen and two others would drive to the back. The officers behind the building would seek to prevent the subject with the gun from escaping through the hole in the rear fence.

When police arrived, it was B.C. who possessed the stolen firearm. He was wearing a white t-shirt with dark sleeves and standing in the breezeway talking with a companion. He carried the gun in an over-the-shoulder bag. When the officers arrived, onlookers began to shout "Police! Police!" B.C. began running, first through the breezeway to the area in front of the building. But when he saw a police car arrive on the street, he quickly turned around and ran back through the breezeway to the area behind the building.

What happened next is disputed, but in this procedural posture, we accept the facts as assumed by the district court in the light most favorable to the plaintiffs. As B.C. ran through the breezeway, he pulled the gun out of his bag. By B.C.'s account, he was holding the gun by the barrel and pointing it down in his right hand. Because he was running fast, his hands moved at least slightly. B.C. testified that the gun did not rise above his waist.

Cohen had just arrived in the parking lot behind the complex when he saw B.C. emerge from the breezeway with a gun in his hand. Cohen promptly exited his vehicle and moved quickly around a truck that was parked between him and the sidewalk leading out from the breezeway. Two seconds after leaving his vehicle, and almost immediately after rounding the back of the truck, Cohen fired four shots at B.C. According to B.C., Cohen gave no warning before shooting.

The first shot missed, and the next three struck B.C.  B.C. says that he dropped the gun after Cohen's first discharge, but the shots were fired in rapid succession. Video evidence shows that B.C. came to rest in the playground area between the sidewalk on his left and playground equipment to his right.  B.C. enters the video frame while sliding to the ground three seconds after Cohen exited his squad car.

The district court denied Cohen's motion for summary judgment, saying that there were genuine disputes of material fact bearing on whether Cohen's use of force was objectively reasonable.  The court cited three disputes: "(1) whether a reasonable officer in Cohen's position would have perceived that B.C. was running toward the officer immediately before the first shot; (2) whether Cohen gave any warning before firing a shot; and (3) if no warning was given, whether it was feasible for Cohen to give a warning."

Excessive force claims under the Constitution are governed by the Fourth Amendment's right of the people to be secure against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989).  The reasonableness of a use of force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him.  *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012).  The issue is whether the totality of the circumstances—including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether the suspect is actively fleeing or resisting arrest—justifies a particular sort of seizure.  *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *Loch*, 689 F.3d at 965.  The use of deadly force is reasonable where an officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others."  *Garner*, 471 U.S. at 11.  If feasible, an officer should give a warning before using deadly force.  *Id.* at 11-12.

The district court thought there were genuine disputes of fact about whether a reasonable officer in Cohen's position "would have perceived" that B.C. was running

-4-

toward the officer before he fired and whether it was feasible for the officer to give a warning before shooting. The implication is that if Cohen reasonably perceived that B.C. was running toward him, and a warning was not feasible, then it may have been reasonable to discharge the firearm. We agree that these are important questions, but they are not questions of fact for a jury. Once the court has assumed a particular set of facts about where and how B.C. was running in relation to Cohen's position, whether B.C.'s actions rose to a level warranting Cohen's use of force is a question of law for the court, not a question of fact. *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2009).

The undisputed facts are that B.C. had run through the breezeway to the back of the building. The evidence shows that he was positioned to the right of the sidewalk that led straight out from the breezeway, and was moving toward the back of the property. Cohen was to the left of the sidewalk in the parking lot. But Cohen was still in front of B.C. at an acute angle to the left, so B.C. was running in Cohen's general direction, even if not directly at him. B.C. was carrying in his right hand a gun that moved while he ran. The officers were investigating a report of a stolen firearm, and B.C. was fleeing from police who had arrived at the front of the building.

Under those circumstances, we conclude that a reasonable officer was justified in discharging his firearm. With only a second or two to react as he rounded the parked truck, Cohen had reasonable grounds to believe that the fleeing subject who was running toward the back of the property could raise the gun and shoot. It would take only an instant to do so if the person were ready to fire. The young man was fleeing with gun in hand, and the officers presented an obstacle to his escape. This was a split-second decision for the officer. It was not practical in that moment for Cohen to discern whether B.C. was carrying the gun in an unusual manner or to shout a warning and wait for him to react. There was simply no time. "When the hesitation involved in giving a warning could readily cause such a warning to be the officer's last, then a warning is not feasible." *Hicks v. Scott*, 958 F.3d 421, 437 (6th Cir. 2020)

(internal quotation and alteration omitted). In dangerous situations where an officer has reasonable grounds to believe that there is an imminent threat of serious harm, the officer may be justified in using a firearm before a subject actually points a weapon at the officer or others. *Malone v. Hinman*, 847 F.3d 949, 954-55 (8th Cir. 2017); *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001). Given the convergence of events, it was not unreasonable for the officer to use force as he did.

We do not accept the appellees' suggestion that Cohen acted unreasonably because he created the danger. It is true that the officers anticipated that a subject might flee to the rear of the building if he encountered police in the front. But police officers investigating a stolen firearm reasonably may position themselves in a way that facilitates apprehension of a suspect. If, as B.C. asserts, he took the stolen gun from his brother with the intention of returning it to the owner, then the outcome is all the more tragic. But B.C. chose to remove the firearm from the bag and flee, rather than carry it away in the bag, stay put and say nothing, or surrender the firearm to police with an explanation. The officer had no way to know B.C.'s subjective intentions, and our analysis must consider only what a reasonable officer on the scene would have perceived. *See Partlow v. Stadler*, 774 F.3d 497, 502 (8th Cir. 2014). The appellees also suggest that the crime under investigation was not serious, but it involved a dangerous weapon, and it is well known that stolen firearms "are used disproportionately in the commission of crimes." *United States v. Bates*, 584 F.3d 1105, 1109 (8th Cir. 2009) (internal quotation omitted).

This situation is not comparable to *Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009), which held it unreasonable for officers, without identifying themselves as police, to shoot without warning a twelve-year-old boy who had a toy gun tucked into his waistband while he was trying to comply with an order to get on the ground. Nor is it like *Craighead v. Lee*, 399 F.3d 954 (8th Cir. 2005), where a police officer encountered an assault victim struggling with a perpetrator over a gun that was pointed in the air, and without warning fired a shotgun blast that killed the innocent

victim. Also distinguishable is *Wealot v. Brooks*, 865 F.3d 1119 (8th Cir. 2017), where police allegedly shot a man who was unarmed and turning around with his hands up to surrender. The confluence of circumstances here—the stolen firearm, the fleeing suspect with a gun moving in his hand, and the need for an officer at an acute angle in front of the subject to make an instant decision about using force—does not match any of our prior decisions. Allowing, as we must, "for the fact that police officers are often forced to make split-second judgments . . . in circumstances that are tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 396-97, we conclude that the force used in this particular situation was not unconstitutional.

The order of the district court denying summary judgment is reversed.

_____