# United States Court of Appeals

### For the Eighth Circuit

_____

No. 23-3329

_____

Reshonda Sanders, as Administrator of the Estate of Donnie Sanders

*Plaintiff*

Latetia Nunley

*Plaintiff - Appellee*

Zahleyiah Fielder

*Plaintiff*

v.

Blayne Newton, In his Individual Capacity

*Defendant - Appellant*

Mark Tolbert; Cathy Dean; Don Wagner; Quinton Donald Lucas; Nathan F. Garrett

*Defendant*s

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: May 9, 2024
Filed: September 25, 2024

_____

Before SMITH, KELLY, and KOBES, Circuit Judges.

_____

SMITH, Circuit Judge.

Officer Blayne Newton of the Kansas City, Missouri Police Department shot and killed Donnie Sanders during a traffic stop. Sanders's children, Latetia Nunley and Zahleyiah Fielder (collectively, "Nunley") filed suit against Officer Newton pursuant to 42 U.S.C. § 1983 for violating Sanders's Fourth Amendment right to be free from excessive force. Officer Newton moved for summary judgment based on qualified immunity. The district court[1] denied Officer Newton's motion, concluding that a genuine issue of material fact exists. Officer Newton appeals the denial of qualified immunity. We dismiss for lack of jurisdiction.

## I. *Background*

Officer Newton, while on patrol one evening, observed a vehicle speeding. He pulled the vehicle over for the routine traffic violation. Sanders, the driver, stopped the vehicle, exited it, and ran. Officer Newton chased Sanders on foot.

After about a half block, Officer Newton caught up to Sanders. According to Officer Newton, the following events then transpired. Officer Newton "yell[ed], police, stop, police, don't move." R. Doc. 51-1, at 8. Sanders turned around and rocked his head back. Sanders walked toward Officer Newton. He had his hands in the pockets of his unzipped jacket. With his hands still inside his jacket pockets, he raised his right hand up and extended it "out as if he had a gun" toward Officer Newton. *Id.* at 9. As Sanders walked toward Officer Newton, Sanders yelled, "I'm

_____

[1]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

-2-

gonna shoot you! I'm gonna get you! Better kill me! I'm gonna kill you!" R. Doc. 48-1, at 1. Officer Newton, with his gun pointed at Sanders, began backing away while "repeatedly yelling 'Police! Get down! Stop! Drop it! You better drop the weapon! Drop the gun!'" *Id.* Sanders did not obey these commands; instead, "he continued to walk toward [Officer Newton] with his hand, which [was] inside his jacket pocket, raised up and pointed at [Officer Newton] as if it were a gun." *Id.* Officer Newton continued retreating while giving commands. Sanders "started to sprint toward [Officer Newton] while his hand, which [was] still inside his jacket pocket, [was] still raised up at [Officer Newton] as if he had a gun pointed at [him]." *Id.* Approximately one or two seconds later, Officer Newton "discharged [his] weapon at [Sanders] five times." *Id.* He was approximately 12 to 15 feet away from Sanders when he fired. Officer Newton ceased firing after Sanders fell to the ground. Officer Newton later learned that Sanders was unarmed.

Officer Newton's microphone was active and able to pick up limited audio during the foot chase.[2] "Officer [Newton] is heard yelling '[H]ey stop!' to [Sanders]." R. Doc. 51-2, at 5 (second alteration in original). Twenty-seven seconds later, Officer Newton called over his radio to other officers with Sanders's description. Six seconds later, "Officer [Newton] is again heard yelling '[S]top!' while still chasing/moving." *Id.* (second alteration in original). After another six seconds, "Officer [Newton] is

---

[2]Officer Newton also testified that dash cam footage did not capture all of the audio or video of everything that transpired. *See* R. Doc. 48-2, at 17–18 ("Q And [the dash cam footage], you'll agree, captures the audio of the entire incident? A No. Q Okay. When does—what does the audio capture? A So . . . that was an old . . . recording system that we had and if you would get so many feet away from your car between buildings, it would chop—you know, kind of be choppy. You'd come in and out. Q So the audio sort of only caught bits and pieces of the incident? A Correct. Kind of like if you're going through a no-reception zone with a phone and it's kind of, you know, chopping in and out.").

again heard yelling commands to '[S]top!'" *Id.* (second alteration in original). After giving his location and requesting that officers leave the radio traffic open, "Officer [Newton] is heard commanding [Sanders] to '[G]et on the ground!'" *Id.* (third alteration in original). Officer Newton is heard yelling, "'[D]rop!' and '[S]top!'" *Id.* (alterations in original). "Seconds later, . . . Officer [Newton] is heard yelling to [Sanders] to '[S]how me your hands!'" *Id.* at 6 (fourth alteration in original). At this point, Sanders's voice is audible on the recording, but "it is unclear what" Sanders responded. *Id.* "After a short pause, . . . Officer [Newton] is heard yelling[,] 'Dude, drop it!' in response to something [Sanders] says." *Id.* Officer Newton then "yells 'Drop!' four times while he is heard moving before firing a series of shots in rapid succession. Immediately after firing the final shot, . . . Officer [Newton] reports '[S]hots fired!' more than once on his radio." *Id.* (third alteration in original). Sanders is again "heard saying something but, again, it is unclear what he is saying. In response, . . . Officer [Newton] is heard yelling commands to '[S]how me your hands!'" *Id.* (third alteration in original). After the shooting, Officer Newton "is heard reporting to other responding officers that [Sanders] has something 'in his pocket' that he was trying to take out." *Id.*

Following an autopsy, the medical examiner's report identified three gunshot wounds on Sanders: "[g]unshot wound of the abdomen," "[g]unshot wound of the right thigh," and "[g]unshot wound of the right elbow." R. Doc. 51-3, at 4–5. Regarding the right-elbow gunshot wound, the report provides:

> A round, 3/8 inch in diameter gunshot wound entrance is on the posterior medial right elbow. A circumferential 1/8 inch in width marginal abrasion surrounds the wound. There is no soot or stippling.
>
> After perforating the skin of the posterior medial right elbow, the bullet perforates with extensive fracturing the bones of the right elbow and penetrates into the lateral right elbow.

A deformed large fragment of projectile is recovered from the lateral right elbow and submitted as evidence.

The direction of the bullet is left to right.

*Id.* at 5.

Nunley filed suit against Officer Newton for violation of decedent Sanders's civil rights under 42 U.S.C. § 1983, alleging excessive use of force. Newton moved for summary judgment based on qualified immunity.[3] The district court denied qualified immunity to Officer Newton, concluding that genuine issues of material fact exist. The court noted a dispute between the parties concerning "facts that are essential to the [c]ourt's analysis of the totality of the circumstances, including the injury, threats made by the decedent, and the decedent's level of noncompliance to demands at the time of the incident." R. Doc. 53, at 5 (footnote omitted). The court then specifically pointed to Nunley's argument "that the forensic evidence from the autopsy shows that [Officer] Newton's shots entered the posterior of Decedent Sanders right medial elbow, which [Nunley] allege[d] does not align with [Officer] Newton's testimony that Sanders was pointing something appearing to be a gun at him." *Id.* at 6 (citing R. Doc. 51, at 8). The court explained that "whether Sanders had his hands pointed as if he had a gun or not is an integral fact in the analysis, and the established facts are disputed." *Id.* Furthermore, Officer Newton's reliance on three unidentified eye witnesses' statements did not resolve these factual disputes because the jury would have to determine the potential witnesses' credibility. Because no video evidence "show[ed] the intricate events leading up to the death of Sanders," the

---

[3]Nunley also brought a municipal liability claim against several officials. Nunley conceded that she failed to adduce sufficient evidence to support this claim, and the district court dismissed it.

court concluded that it was unable to "resolve these disputes of material fact, a function of the jury." *Id.*

## II. *Discussion*

On appeal, Officer Newton argues that Nunley's excessive-force claim is barred under the Eleventh Amendment. Alternatively, he argues that the district court erroneously denied him qualified immunity because no genuine issue of material fact exists.

### A. *Eleventh Amendment*

Newton argues that he is entitled to sovereign immunity under the Eleventh Amendment because Nunley did not state in her complaint that she was suing Newton in his personal capacity; therefore, she is suing him only in his official capacity. According to Newton, because the Kansas City Board of Police Commissioners (Board) is primarily selected by the Missouri governor and has its budget controlled and overseen by the Missouri government, the Board is a state instrumentality. Newton is a Board employee. Thus, he concludes that the Eleventh Amendment bars damages suits against him as an official-capacity defendant employed by the State.

"We [have] previously held that when 'a plaintiff's complaint is silent about the capacity in which she is suing the defendant,' the claims should be treated as 'only official-capacity claims.'" *Wealot v. Brooks*, 865 F.3d 1119, 1123 n.4 (8th Cir. 2017) (quoting *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 619 (8th Cir. 1995)). "We have continued to apply our more stringent pleading rule, and in one instance even [did] so when the parties and district court ignored the capacity issue in the first instance." *Id.* (citing *Remington v. Hoopes*, 611 F. App'x 883, 884–85 (8th Cir. 2015) (unpublished per curiam)).

Nunley admits that she failed to "use the magic words 'individual-capacity' in the [c]omplaint." Appellee's Br. at 13. Nonetheless, she maintains that she brought "claims . . . against Defendant Newton in his individual capacity and against the members of the Kansas City Board of Police Commissioners as a *Monell* style claim." *Id.* (emphasis added). More specifically, she notes that she "explicitly ma[de] a municipal liability claim" against the Board and "ma[de] a claim against [Officer] Newton specifically for his actions alleged to have resulted in a Fourth Amendment violation." *Id.* at 14. She asks this court to liberally construe her amended complaint so that the counts against Officer Newton and the Board are not duplicative. She further points out that she "explicitly . . . requested leave to Amend in her Response [in Opposition to Officer Newton's Motion for Summary Judgment] to explicitly state it was an individual capacity claim." *Id.*

Nunley concedes that this court "takes a hardline approach to interpreting whether a claim is made in an individual or official capacity." *Id.* (citing, among others, *Murphy v. Arkansas*, 127 F.3d 750, 754–55 (8th Cir. 1997) (holding Eleventh Amendment presents jurisdictional limit on federal courts in civil rights cases against states and their employees, and thus courts require that personal capacity § 1983 claims be clearly pleaded)). Although Nunley acknowledges that "[t]his approach requires [her] to explicitly state that a claim is an individual-capacity claim," she maintains that her "lack of explicitness in the Amended Complaint is not fatal to [her] here." *Id.* at 14–15.

Nunley contends that the present case is comparable to *Murphy*, in which we "deem[ed] the complaint amended" "to state personal-capacity equal protection claims." 127 F.3d at 755. In that case, the plaintiff's "initial complaint contained no . . . clear statement" that the plaintiff was suing the defendants "in their personal capacities." *Id.* at 754. "Therefore, the individual defendants contended in their motion for summary judgment that the Eleventh Amendment totally bar[red] [the

plaintiff's] damages claims. [The plaintiff] responded by filing a motion for leave to amend his complaint to assert personal capacity claims." *Id.* "[T]he district court denied the individual defendants summary judgment on Eleventh Amendment grounds" "[w]ithout ruling on the motion to amend." *Id.* It reasoned that the "defendants [could not] seriously argue that they had no notice that they were sued in [their] individual capacities." *Id.* at 754–55 (second alteration in original). On appeal, the defendants contended that the district court erroneously concluded that the Eleventh Amendment did not bar the plaintiff's § 1983 damage claims. *Id.* at 754.

We acknowledged the district court's "err[or] in excusing [the plaintiff's] failure to clearly assert personal capacity claims in his initial complaint." *Id.* at 755. But this error "d[id] not resolve the issue." *Id.* This was because "[w]hen defendants sought summary judgment on [Eleventh Amendment] ground[s], [the plaintiff] moved to amend his complaint." *Id.* However, "the district court ha[d] not ruled on that motion, which [was] committed to its sound discretion." *Id.* We held:

> Given the district court's conclusion that defendants had sufficient notice they were being sued in their personal capacities, we are confident that the district court would grant [the plaintiff] leave to amend the complaint to state personal-capacity equal protection claims if we remanded for consideration of that issue. And given the liberality of Fed. R. Civ. P. 15(a) regarding amendments, granting such leave to amend would not abuse the court's discretion. Thus, we deem the complaint amended and affirm this portion of the district court's Eleventh Amendment ruling.

*Id.* (citations omitted).

We agree with Nunley that *Murphy* resolves the Eleventh Amendment issue in this case. In his answer to Nunley's first amended complaint, Officer Newton asserted that the § 1983 "claim against [him] in his individual capacity [is] barred by qualified

immunity." R. Doc. 24, at 8. He separately argued that the § 1983 claim "against [him] in his official capacity is barred by 11th Amendment immunity." *Id.* Thus, Officer Newton had "sufficient notice [he was] being sued in [his] personal capacit[y]." *Murphy*, 127 F.3d at 755. And, like the defendants in *Murphy*, it was not until Officer Newton filed his motion for summary judgment that he first argued that Nunley brought only official-capacity claims against him. *See* R. Doc. 48, at 3 ("Plaintiffs bring only official-capacity claims against Newton, which are barred as a matter of law." (bold omitted)). In her response in opposition to the motion for summary judgment, Nunley requested leave to amend the complaint, stating:

> To the extent the [c]ourt requires, [Nunley] seeks leave to amend the [c]omplaint to specifically assert an individual capacity claim [against Officer Newton]. Such an amendment is in the interest of justice and does not prejudice [Officer Newton] in any way as all of the relevant issues have been addressed in discovery and are discussed in the instant motion.

R. Doc. 51, at 6 n.2 (citing Fed. R. Civ. P. 15(a)(2); *Davis v. White*, 794 F.3d 1008, 1015 (8th Cir. 2015)). As in *Murphy*, the district court did not rule on Nunley's request. *See* 127 F.3d at 754.

Nunley's request to seek leave to amend her complaint is comparable to the plaintiff in *Murphy* who filed a separate motion for leave to amend his complaint. *See id.* As in *Murphy*, "we are confident that the district court would grant [Nunley] leave to amend the complaint to state personal-capacity equal protection claims if we remanded for consideration of that issue," given that the district court has already analyzed Officer Newton's request for qualified immunity. *Id.* at 755. Further, "given the liberality of Fed. R. Civ. P. 15(a) regarding amendments, granting such leave to

amend would not abuse the court's discretion." *Id.* We deem Nunley's complaint amended. *See id.*[4]

## B. *Qualified Immunity*

Nunley alleges that Newton used excessive deadly force against Sanders in violation of his Fourth Amendment rights. "An objectively unreasonable use of force is excessive, violating the Fourth Amendment's prohibition against unreasonable seizures." *Williams v. City of Burlington*, 27 F.4th 1346, 1350–51 (8th Cir. 2022). Whether an officer used reasonable "force turns on whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his subjective intent or motivation." *Id.* at 1351 (internal quotation marks omitted). "[P]roper application" of the Fourth Amendment's reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Wealot*, 865

---

[4]Officer Newton also argues that the district court erroneously failed to address his official immunity from suit under Missouri law. But Nunley brought a § 1983 claim, not a Missouri state-law claim. Official immunity applies only to state-law claims, not a federal § 1983 claim. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 243–44 (3rd Cir. 2006) ("[W]e hold that the doctrine of high official immunity under Pennsylvania law does not shield Marino from suit under § 1983. That doctrine shields high officials from state law claims, not constitutional claims."); *Kohn v. Sch. Dist.*, No. 1:11-cv-109, 2012 WL 1598096, at *8 (M.D. Pa. May 7, 2012) ("[T]he state-law doctrine of high public official immunity shields officials only from state-law claims, not federal ones.").

F.3d at 1125 (internal quotation marks omitted). But "an officer may not use deadly force against a fleeing suspect *unless* the suspect poses *an immediate and significant threat* of serious injury or death to the officer or to bystanders." *Wallace v. City of Alexander*, 843 F.3d 763, 769 (8th Cir. 2016) (cleaned up). "Officers *may not* seize . . . unarmed, nondangerous suspects by shooting them dead." *Id.* (emphasis added) (cleaned up). Although "it is true that '[a]n officer is not constitutionally required to wait until he sets eyes upon the weapon before employing deadly force,'" "this rule applies when an officer is trying to 'protect himself against a fleeing suspect' who is armed or reaching for what appears to be a weapon." *Ngo v. Storlie*, 495 F.3d 597, 603 (8th Cir. 2007) (quoting *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001)).

Officer Newton has brought an interlocutory appeal from the district court's denial of qualified immunity on Nunley's excessive-force claim. "Qualified immunity protects reasonable mistakes of fact. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Williams*, 27 F.4th at 1351 (internal quotation marks and citation omitted). "[W]hen analyzing a claim of qualified immunity, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment"; instead, courts are required to "construe the facts in the light most favorable to the nonmovant to determine whether a constitutional violation occurred and whether any violation of a constitutional right was clearly established." *Id.* (cleaned up). Courts ask two questions in analyzing a public official's entitlement to qualified immunity: "1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right and 2) whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Id.* at 1350 (internal quotation marks omitted). "The court may consider them in either order." *Presson v. Reed*, 65 F.4th 357, 365 (8th Cir. 2023).

-11-

Under the second inquiry in an excessive-force case, "the issue is . . . whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate the right not to be seized by the use of excessive force." *Williams*, 27 F.4th at 1352 (cleaned up). "Since 1985, it has been established by the Supreme Court that the use of deadly force against a fleeing suspect who does not pose a significant threat of death or serious physical injury to the officers or others is not permitted." *Id.* (quoting *Moore v. Indehar*, 514 F.3d 756, 763 (8th Cir. 2008) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985))). This right "is sufficiently clear." *Id.* (citing *Capps v. Olson*, 780 F.3d 879, 886 (8th Cir. 2015) ("[A] reasonable officer would have understood that use of deadly force against a fleeing suspect who does not pose a significant and immediate threat of serious injury or death to an officer or others is not permitted."); *Nance v. Sammis*, 586 F.3d 604, 610 (8th Cir. 2009); *Moore*, 514 F.3d at 763 (determining that a jury could find an officer's decision to use deadly force against an unarmed person fleeing the scene of a shooting objectively unreasonable); *Wallace*, 843 F.3d at 769 ("[A]n officer violate[s] *Garner* by using deadly force to seize an individual who did not possess a weapon and was attempting to flee the scene of a potentially violent crime."); *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005) ("At least since *Garner* was decided . . . officers have been on notice that they may not use deadly force unless the suspect poses a significant threat of death or serious physical injury to the officer or others.")).

Here, the district court determined that a genuine issue of material fact exists as to whether "Sanders was pointing something appearing to be a gun at [Officer Newton]." R. Doc. 53, at 6. While Officer Newton testified that Sanders did so, the autopsy report—which showed that Officer "Newton's shots entered the posterior of Decedent Sanders right medial elbow"—could be interpreted as "not align[ing] with [Officer] Newton's testimony." *Id.* According to the district court, this disputed fact prevented it from analyzing the reasonableness of Officer Newton's actions. *Id.*; *see*

*also Graham*, 490 U.S. at 396 (setting forth factors for courts to consider in making excessive-force determinations).

We "review[] *de novo* the district court's denial of summary judgment based on a lack of qualified immunity." *Williams*, 27 F.4th at 1350. "The first and fundamental question in an appeal from a denial of qualified immunity is that of jurisdiction." *Torres v. City of St. Louis*, 39 F.4th 494, 502 (8th Cir. 2022) (internal quotation marks omitted). In this posture, "our jurisdiction is limited to the purely legal question of whether the conduct that the district court found was adequately supported in the record violated a clearly established federal right." *Id.* (internal quotation marks omitted). As a result, "we may review the purely legal question of whether a factual dispute is material." *Id.* (cleaned up); *see also Mulbah v. Jansen*, 55 F.4th 1164, 1167 (8th Cir. 2022) ("We may hear an appeal of an order denying qualified immunity where the record plainly forecloses the district court's finding of a material factual dispute." (cleaned up)). But we lack "jurisdiction to review a district court's denial of qualified immunity simply because we disagree with the district court as to whether there is sufficient evidence to conclude a material fact is genuinely in dispute." *Mulbah*, 55 F.4th at 1166 (cleaned up).We are also prohibited from "decid[ing] which facts a party may, or may not, be able to prove at trial." *Id.* (internal quotation marks omitted). And "we lack jurisdiction to review the [district] court's factual assumptions." *Id.* We "may not make determinations of fact and credibility in assessing whether a party is entitled to qualified immunity." *Williams*, 27 F.4th at 1351. In summary, "we lack jurisdiction to consider an argument that the plaintiff has proffered insufficient evidence to create a genuine issue of fact, but we have jurisdiction to consider an argument that the disputed facts to which the plaintiff cites are unable to affect the outcome of the suit." *Torres*, 39 F.4th at 502 (cleaned up).

In the present case, Officer Newton concedes that Sanders was unarmed when he shot him but asserts that his mistaken belief is objectively reasonable. "In many cases, we have affirmed the grant of qualified immunity to officers who applied deadly force to an unarmed suspect because we concluded the officers held a reasonable belief the suspect was dangerous." *Wealot*, 865 F.3d at 1128.[5] As we have recognized, "[a]n act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." *Id.* (internal quotation marks omitted).

"[T]he record here does not conclusively establish the reasonableness of [Officer Newton's] actions." *Id.* (internal quotation marks omitted). "Before the reasonableness of [Officer Newton's] conduct can be assessed, [a] genuine dispute[] of material fact must be resolved," *id.* at 1125: whether "Sanders was pointing something appearing to be a gun [at Officer Newton]," R. Doc. 53, at 6. Officer Newton testified that Sanders advanced toward him with right hand—inside his jacket pocket—raised up and extended "out as if he had a gun" toward Officer Newton. R. Doc. 51-1, at 9. The autopsy shows that the bullet that struck Sanders "perforat[ed] the skin of [his] posterior medial right elbow," which means Sanders was hit on the inner back side of his right elbow. R. Doc. 51-3, at 5. The bullet then exited the

_____

[5]*See, e.g.*, *Seiner v. Drenon*, 304 F.3d 810, 811 (8th Cir. 2002) (stating that the officer "repeatedly ordered [the suspect] to show his hands" and to drop whatever was in his hands); *Billingsley v. City of Omaha*, 277 F.3d 990, 993–94 (8th Cir. 2002) (stating that the suspect ran after being told to halt, "leapt off the deck onto the ground," and "turned and rotated his shoulder" upon landing); *Thompson*, 257 F.3d at 898 (stating that the suspect and the officer were involved in "[a] foot chase," that the suspect "moved his arms as though reaching for a weapon," and that the officer yelled "'stop' . . . when [the suspect's] arms continued to move"); *Krueger v. Fuhr*, 991 F.2d 435, 437 (8th Cir. 1993) (stating that the officer ordered the suspect to "freeze" several times during a chase and that the officer saw the suspect "reach to the area of his right hip" to pull out a knife).

"lateral" (outside) of the right elbow. *Id.* The bullet moved "left to right," not up or down. *Id.* One interpretation of the autopsy—and the one proffered by Nunley—is that Officer Newton shot Sanders when his right arm was "raised above his head, allowing the bullet to enter the inside back of the elbow and travel to the outer portion of the elbow." Appellee's Br. at 11. Accepting this interpretation of the autopsy, Officer Newton's "testimony does not conclusively disprove the version of events that are most favorable to [Nunley]." *Mulbah*, 55 F.4th at 1167 (cleaned up). It is undisputed that Sanders was, in fact, not armed at the time of the shooting. If he also had his arm raised "above his head" at the time of the shooting, this suggests an "attempt to surrender" inconsistent with Officer Newton's testimony that Sanders extended his right hand out toward him. Appellee's Br. at 12. Based on the autopsy, a genuine issue of *material* fact exists as to whether Sanders posed a significant threat to Officer Newton. *See Wallace*, 843 F.3d at 769.

At the time that Officer Newton shot Sanders, it was clearly established that the use of deadly force against a fleeing suspect who poses no significant threat to the officer is unconstitutional. *See Williams*, 27 F.4th at 1352. "[T]o determine whether [Newton] violated clearly established law, we need to know what happened. Because the factual record—as assumed by the district court—is unsettled and disputed, we lack jurisdiction to go further." *Mulbah*, 55 F.4th at 1167.[6]

### III. *Conclusion*

Accordingly, we dismiss the appeal for lack of jurisdiction.

---

[6]We agree with the district court that any consideration of the three unidentified eye witnesses' statements does not resolve the factual dispute between Officer Newton's testimony and the autopsy. Ultimately, the jury would have to determine the credibility of those witnesses, as well as the proper interpretation of the autopsy.

KOBES, Circuit Judge, concurring in part and concurring in the judgment.

Officer Newton points to multiple errors in the district court's analysis. He says, among other things, that the district court misapplied the summary judgment standard and denied him qualified immunity without a dispute of material fact and by improperly making credibility determinations. Even if he is right – and I think he might be in part – it doesn't change the outcome of this appeal. The case turns on the autopsy report, which the district court found, and Officer Newton concedes, "may or may not conform to [his] story." The majority opinion rightly concludes that we lack jurisdiction to review that finding. I join in parts I, II.A, and III of the Court's opinion, and concur in the judgment.

_____